UNITED STATES of America, Plaintiff-Appellee,

v.

Carlos HERRERA, Victor Hugo Herrera, and Felipe Santiago Herrera, a/k/a "Chiquito", Defendants-Appellants.

Nos. 1118, 1119 and 1120, Dockets 78–1145, 78–1146 and 78–1147.

United States Court of Appeals, Second Circuit.

Argued May 26, 1978.

Decided Aug. 3, 1978.

Kassner & Detsky, P. C., New York City (Herbert S. Kassner, New York City, of counsel), for appellants Carlos Herrera and Felipe Santiago Herrera.

Ralph J. Schwarz, Jr., New York City, for appellant Victor Hugo Herrera.

Peter D. Sudler, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Gaines Gwathmey, III, and Richard D. Weinberg, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before OAKES, Circuit Judge, and BLUMENFELD * and MEHRTENS, Senior District Judges.**

* Sitting by special designation from the District of Connecticut.

** Sitting by special designation from the Southern District of Florida.

MEHRTENS, Senior District Judge.

Carlos Herrera, Victor Hugo Herrera and Felipe Santiago Herrera appeal from a judgment of conviction entered after a jury trial upon a four-count indictment.

Count 1 charged each of the Herrera brothers with conspiracy to harbor illegal aliens and use of the facilities of interstate commerce to operate an illegal enterprise, in violation of Title 18 U.S.C. § 372.

Count 2 charged each of the Herrera brothers with harboring illegal aliens whom they employed as prostitutes, in violation of Title 8 U.S.C. § 1324.

Count 3 charged each of the Herrera brothers with using the facilities of interstate commerce to conduct a house of prostitution, an illegal enterprise under the laws of New York, in violation of Title 18 U.S.C. § 1952.

Count 4 charged Victor Hugo Herrera with illegally re-entering the United States after having once been deported, in violation of Title 8 U.S.C. § 1326.

The jury returned guilty verdicts against all three defendants on Counts 1, 2 and 3, and against Victor Herrera on Count 4.

All defendants now appeal, urging numerous points of error. Finding none of their contentions meritorious, we affirm.

### The Facts

Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence and reasonable inferences therefrom showed:

For two and a half years Carlos, Victor and Felipe Herrera, three brothers from Argentina, owned and operated a large "massage parlor" known as the Pleasure Seekers Club in New York City, which was in fact a house of prostitution.

During the period alleged in the indictment, June 1975 to October 1977, the Herrera brothers took an active role in the operation of the Pleasure Seekers Club. Each was physically present at the club in a managerial capacity, and each brother participated in hiring and paying the prostitutes employed there. Carlos was most active in the management in that he rented the space and supervised the remodeling and the installation of the security and alarm systems. Both Carlos and Victor explained the various house rules of procedure to the prostitutes, while Felipe functioned as the "bouncer" in addition to other duties.

The profitable operation of the Pleasure Seekers Club depended upon the defendants' ability to offer prostitutes a secure place to work where there would be little chance of arrest by the New York City Police (NYPD), or for non-citizens, detention and deportation by the Immigration and Naturalization Service (INS). The defendants used various means in their attempts to maintain such security. Among these were: (1) "Hostess" agreements, which the prostitutes were required to sign on a weekly basis, stating that the signatory was not involved in prostitution, apparently hoping that this would provide a basis to deny knowledge of prostitution on the premises; and (2) a security system, including closed-circuit television and alarms, which would signal the prostitutes of the presence of either NYPD or INS officials.

Four prostitutes who were employed by the defendants testified as to the daily operation of the Pleasure Seekers Club. Each went to the Pleasure Seekers Club seeking employment as prostitutes and was hired by one or more of the defendants. Once hired, these witnesses discovered that the club employed between 30 and 50 prostitutes at a given time. At the end of the working day the women were paid approximately one half of the face value of their tickets, less an additional 10% for "protection" and legal fees, as well as certain miscellaneous charges for laundry and keys. The women earned between $100 and $250 a day for their work as prostitutes and worked seven days a week.

Among the women employed by the Herrera brothers as prostitutes were numerous illegal aliens. On June 4, 1976, a raid of the club by INS resulted in the arrest of ten women for being in the United

States illegally. The prostitutes who testified stated that the illegal aliens were assigned to work in the "middle section" of the club. It had a direct exit to the street to facilitate escape.

The club leased an extensive video security system and utilized a method of alarm signals to warn the prostitutes of any raid by the police or the Immigration Service. The women were instructed that the sounding of a long single alarm meant an INS raid, and the sounding of two alarms meant a police raid. In the event of an INS raid, the illegal aliens were instructed by the defendants to get dressed, quietly go to the middle section and, if possible escape via the back staircase.

All three of the Herrera brothers were active in efforts to conceal the presence of the illegal aliens at the club from the Immigration Service. One of the prostitutes, who was concerned about her illegal immigration status, told both Carlos and Victor on several occasions that she was in the country illegally, and was assured by Carlos that she would be forewarned by the alarm of any INS raid. On one occasion Victor told her and other prostitutes that he suspected an impending raid by the Immigration Service and that the women should await his orders. On at least one occasion, during November 1975, Carlos instructed a resident alien prostitute from the Dominican Republic always to maintain that she was from Puerto Rico, as this was part of the rules of the house in regard to aliens. On May 19, 1976 two INS officials went to the premises of the Pleasure Seekers Club. They identified themselves to Felipe, who was at the front counter, whereupon Felipe ran toward the rear portion of the building yelling "Immigration" several times in Spanish to warn the prostitutes of the presence of INS.

From June 1976 to October 1977 Carlos and Felipe Herrera lived at a condominium in New Jersey and commuted on a daily basis to and from their business at the club in Manhattan. During the same period Victor visited his former common-law wife and son at the same condominium in New Jersey, staying overnight and then going to work at the club in New York. All three Herrera brothers were at the condominium regularly.

A number of interstate telephone calls were made by the defendants relating to the business of the Pleasure Seekers Club. The man who installed and maintained the closed circuit television system returned a phone call from his New York office to Carlos Herrera in New Jersey concerning the leasing of video security equipment at the club. A New Jersey prostitute, who commuted to her employment at the club in New York on a daily basis, received several telephone calls at her home in New Jersey from Victor and others from the "Club" in New York inquiring as to her whereabouts when she failed to report for work. In addition, the government produced telephone toll records that showed hundreds of phone calls between the club in New York and each of the defendants' three condominiums in North Bergen, New Jersey over a period of several months in 1977.

On the evening of June 6, 1976, when the defendants and some of the prostitutes were being detained at INS headquarters, Carlos made a hand gesture toward an illegal alien prostitute whom he employed, indicating that she would be shot if she gave information against him to INS officials.

Subsequently, during July 1976, Carlos threatened the life of her child in Argentina and also her fiance. She was taken to Herrera's lawyer's office where she was forced to sign an affidavit alleging that INS officials had tortured her to gain her cooperation.

Following the defendants' indictment in October 1977, Victor and Felipe met with the estranged husband of an illegal alien prostitute who had given information to INS against the defendants. The Herreras asked him to influence her not to testify against them. At two subsequent meetings in January and February, 1978, respectively, Carlos threatened harm to their child if he did not so influence his wife. Victor was present on one of these occasions.

At the trial Victor stipulated that on April 16, 1971 he was deported from the United States; that after his deportation he later made an unauthorized re-entry into the United States; that he was found at the Pleasure Seekers Club in New York on June 4, 1976 and that he had never secured the required permission of the Attorney General of the United States to re-enter.

### Asserted Misjoinder of Counts and Nonseverance of Parties

The defendants contend their convictions should be reversed because of impermissible joinder of offenses and of defendants.

█ In order to avoid proof under Count 4 that while illegally in the United States on a prior occasion he was a procurer and engaged in a business that enabled him to live off the proceeds of prostitution, Victor, as a matter of trial strategy, stipulated that he had been deported in 1971; that he re-entered the United States and was found at the Pleasure Seekers Club on June 4, 1976; and that his re-entry was not authorized by the Attorney General, thereby admitting his guilt. This stipulation was agreed to by Victor and his attorney and also by Carlos' attorney. This was the only evidence as to Count 4. This evidence did not prejudice the other defendants. Moreover, we think that this evidence was not only "simple" but also sufficiently distinct to enable the jury to keep it separate, especially where, as here, the trial judge carefully gave appropriate limiting instructions.

The possibility of "criminal propensity" prejudice or cumulation was not enlarged by the joinder of Count 4 with Counts 1, 2 and 3 because the evidence relating to Count 4 would have been admissible in a separate trial upon the other counts.

█ The question of severance or common trial is vested under Fed.R.Crim.P. 14 in the sound discretion of the trial judge. His decision will be reversed on appeal only upon a clear abuse of that discretion. To be an abuse of discretion by the trial judge, it must be shown that the defendants did not receive a fair trial, that a "miscarriage of justice" has occurred. *Schaffer v. United States,* 221 F.2d 17 (5th Cir. 1955); *United States v. Frazier,* 394 F.2d 258) *cert. denied,* 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445, (1968) 53 *Am.Jur.,* p. 65 § 56. Clearly there was no abuse of discretion by the trial court in this instance where there would be no danger that the jury would be confused in the application of the simple facts under Count 4 to the other separate crimes. We are satisfied that an abuse of discretion did not result; that no injustice arose from the joint trial; and that the defendants had a fair trial, free of prejudicial error.

We need not further consider, however, defendants' claim of misjoinder since, assuming *arguendo* there was error, it would be harmless. The evidence against these defendants on all counts was overwhelming. Moreover, the defendants were given concurrent sentences for all of the offenses of which they were convicted.

It is well settled in this circuit that the harmless error doctrine applies to misjoinder of counts under Fed.R.Crim.P. 8(b). In many decisions this circuit has held that when evidence tending to prove the charge that should have been severed would nevertheless have been admissible at the trial of the objecting co-defendant, and was admitted subject to appropriate limiting instructions, any error was harmless. *See, e. g. United States v. Turbide,* 558 F.2d 1053 (2d Cir. 1977); *United States v. Chestnut,* 533 F.2d 40, 49 (2d Cir.), *cert. denied,* 420 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Santiago,* 528 F.2d 1130, 1134 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Payden,* 536 F.2d 541, 543 (2d Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976); *United States v. Papadakis,* 510 F.2d 287 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *Cf. Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960) (no prejudice by joint trial where rule framed in terms of prejudice).

We find no merit to this contention.

**1144**

*Defendants' Harboring Illegal Aliens*

■ The defendants next argue that there was insufficient evidence to sustain their convictions for harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(3).[1] On appeal, it is our function to determine whether a reasonably minded jury could accept as adequate and sufficient the evidence and reasonable inferences therefrom to support the conclusion of the defendants' guilt beyond a reasonable doubt. *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The defendants rely primarily upon their argument that they come within the statutory exception because they merely "employed" illegal aliens. The defendants assert that the acts alleged to constitute harboring were in connection with and incidental to the aliens' employment, and thus not criminally punishable. The defendants suggest that whenever an employment relationship exists there can be no harboring without the alien actually living on the premises.

We find this contention to be without merit because the Herrera brothers not only knowingly employed illegal alien prostitutes at their house of prostitution but also harbored, concealed, and shielded them from detection, thereby coming within the purview of Section 1324(a)(3).

■ The employment proviso does not exempt employers from the operation of the statute, rather, it is a refinement of what is meant by "harboring" and only comes into play should a defendant wish to establish that his acts constituted employment, or the usual and normal practices incident thereto, and not harboring. See *McKelvey v. United States*, 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922). The plain meaning of practices incident to employment refers not to defendants' own practices but those necessary to the kind of

employment generally. An employer who goes beyond the "normal" incidents of employment may violate the statute. *Gordon & Rosenfield 2, Immigration Law and Procedure,* § 9.23c. Otherwise, all employers and not just the active employment would be without the statute. What is necessary for the government to show is what might be termed employment, together with "conduct tending substantially to facilitate an alien's 'remaining in the United States illegally.'" *United States v. Lopez, infra.* Such conduct need not be clandestine. *United States v. Acosta de Evans*, 531 F.2d 428 (9th Cir. 1976). In short, if, despite the employment relationship, defendants have acted by providing shelter or other services to substantially facilitate the aliens remaining in this country illegally, they may be found guilty of harboring.

In *United States v. Lopez*, 521 F.2d 437 (2nd Cir. 1975), this court in affirming a defendant's conviction for harboring illegal aliens, said:

Although our task would have been lightened if Congress had expressly defined the word 'harbor,' we are persuaded by the language and background of the revision of the statute that the term was intended to encompass conduct tending substantially to facilitate an alien's 'remaining in the United States illegally,' provided, of course, the person charged has knowledge of the alien's unlawful status.

* * * We are satisfied that appellant's conduct is clearly encompassed within the meaning of § 1324 and that the construction urged by him would have the effect of failing to implement its language and purpose.

In *United States v. Cantu*, 557 F.2d 1173 (5th Cir. 1977), that court, in likewise affirming a conviction for a violation of the

---

1. 8 U.S.C. § 1324(a)(3) provides in pertinent part:

 (a) Any person, . . . who— . . .
 (3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any

means of transportation; . . . any alien . . . shall be guilty of a felony. . . .
 Provided, however, That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

same statute, where the defendant knowingly employed illegal aliens in his restaurant, said:

> * * * We agree with the conclusion in *Lopez* that section 1324 does not prohibit only smuggling-related activity, but also activity 'tending substantially to facilitate an alien's "remaining in the United States illegally." '

557 F.2d at 1180.

Under the predecessor to the present statute this court in *United States v. Smith*, 112 F.2d 85 (2nd Cir. 1940), held that a conviction for harboring was sufficient by proof that the alien prostitutes employed by the defendant were told to reveal to no one that they were Canadians but rather to say that they were from a town in New York, and that the word "harbor" means only that the girls shall be sheltered from the Immigration authorities and shielded from observation to prevent their discovery as aliens.

■ The evidence clearly showed that the defendants employed numerous illegal aliens as prostitutes; that these illegal aliens were kept in a common section of the premises and provided with a means of escape by the defendants in the event INS officials should enter the premises. To prevent detection by the INS the defendants installed and utilized closed circuit television cameras and an alarm system to warn illegal aliens that INS officials were on the premises and to alert prostitutes of raids by the NYPD. A single alarm meant an INS raid and the sounding of two alarms meant a police raid. The jury could, and we must assume, did believe that the illegal aliens were instructed by the defendants that if the alarm was raised, they should get dressed, go to the center section, and leave on a rear staircase, if possible. The proof further showed that when INS officials went to the premises and identified themselves to Felipe, he immediately ran past them into the portion of the premises where the prostitutes were and yelled "Immigration" several times in Spanish to warn the illegal aliens of the INS presence. Furthermore, the proof showed that the defendants

knew that many of the prostitutes they employed were illegal aliens and that at least on one occasion one of the defendants instructed a resident alien of Dominican nationality to tell everyone she was from Puerto Rico.

These acts are more than sufficient to constitute conduct tending substantially to facilitate the aliens remaining in the United States illegally and were therefore a violation of the statute.

*Defendants' Use of Interstate Facilities*

■ The Travel Act (18 U.S.C. § 1952) makes it a crime to use an interstate facility with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," including "any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed * * ." The defendants contend that their use of interstate facilities was at best minimal, incidental and so peripheral as to amount to mere happenstance; that they were not beyond the reach of local law enforcement officers and therefore application of the Travel Act was improper and their convictions should be reversed. They rely mainly upon *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), and three of its progeny, *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971); *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) and *United States v. Brecht*, 540 F.2d 45 (2d Cir. 1976).

We cannot agree. None of these cases calls for reversal of the Travel Act convictions here. In *Rewis* the Supreme Court held that neither the language nor the legislative history of the Travel Act showed that Congress intended the statute to apply to a purely local gambling operation just because some of its *customers* crossed state lines. We are, of course, bound by any constructions put upon a statute by the Supreme Court; but we discern none in *Rewis* that prevents application of the Travel Act to these defendants. *United States v. LeFaivre*, 507 F.2d 1288 (4th Cir.

1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

*Altobella* reached a similar result in a case where the only use of interstate facilities resulted from an extortion victim cashing a check on an out-of-state bank to pay off the defendants.

In *Archer* this court focused on despicable actions by the police of having a government agent make a single interstate telephone call to a defendant, but based its reversal on insufficient use of interstate channels to bring the Travel Act into play. On re-hearing this circuit explained its decision in very narrow channels, stating:

> While the Government professes alarm at the precedential effect of our decision, we in fact went no further than to hold that when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves and that this was not met here.

*Archer*, involving a single telephone call placed by a government agent to one of the defendants, is clearly distinguishable from the instant case. Neither the unsavory police practices that colored that decision nor the government's initiation of the interstate aspect of the criminal activity are present here. The record here, unlike *Archer*, discloses continuous interstate travel by the defendants from their homes in New Jersey to their prostitution operation in New York; several interstate calls by defendants related specifically to the operation of their prostitution business; and hundreds of phone calls between the club in New York and each of the defendants' three condominiums in New Jersey over a period of several months.

*Brecht* merely holds that the term "bribery" in Section 1952 of the Travel Act does not embrace "commercial bribe receiving" as defined in the New York Penal Law.

█ With respect to the defendants' travel and the numerous telephone calls between New York and New Jersey it is settled that evidence of a substantial course of illegal conduct, occurring a reasonable time before and after an act of interstate travel, permits the jury to infer that the travel in interstate activity was undertaken with the intent to carry on the unlawful activity. *United States v. Sapperstein*, 312 F.2d 964 (4th Cir. 1963); *United States v. Farber*, 336 F.2d 586 (6th Cir. 1964); *United States v. Compton*, 355 F.2d 872 (6th Cir.), *cert. denied*, 384 U.S. 951, 86 S.Ct. 1571, 16 L.Ed.2d 548 (1966); *United States v. Harris*, 275 F.Supp. 161 (D.C.Va.1967), *affirmed* 399 F.2d 687 (4th Cir. 1968).

The case at hand shows a knowing and intentional use of interstate commerce by members of the conspiracy, which cannot be said to have been incidental or peripheral to this activity.

In *United States v. Barrow*, 363 F.2d 62 (3rd Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1968), six of the defendants lived in New Jersey and regularly travelled from their homes to a gambling casino in Reading, Pennsylvania, and participated in its operation as overseers, dice rollers or doormen, thereby facilitating the gambling. As to these men the court stated that each of them knew that his own travel interstate was necessary to enable him to participate in the gambling, and that thus the evidence was sufficient for the jury to find that they travelled with intent to facilitate the gambling by working at it. The defendants argued that the United States was required to prove that the interstate travel was an integral part of and essential to the gambling operations and this requirement had not been met. The court, in upholding the convictions and refuting this argument, said that Section 1952 prohibited in broadest terms interstate travel with requisite intent, followed by performance of or the attempt to perform any act, to promote or facilitate unlawful activity as defined in the Act, and held that there was nothing in the statute which limited its application to interstate travel essential to the unlawful activity. Likewise, the defendants here regularly travelled from New Jersey to New York and regular-

ly participated in the operation of their house of prostitution. Each of them knew that his own interstate travel was necessary to enable him, together with his brothers, to promote, manage, carry on and facilitate that business. *See also: United States v. Lee*, 448 F.2d 604 (7th Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 107, 30 L.Ed.2d 100 (1971); *United States v. Ryan*, 548 F.2d 782, 787 (9th Cir. 1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977); *United States v. Carpenter*, 392 F.2d 205, 206–07 (6th Cir. 1968); *Cf. United States v. Villano*, 529 F.2d 1046, 1055 (10th Cir.), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976); *United States v. LeFaivre, supra*.

The defendants' argument that they were not subject to prosecution because the Act was intended to apply only to "top men of Organized Crime" who lived far from the scene and so defendants could not be prosecuted under the Act because they were not beyond the reach of local law enforcement officials is similarly without merit. Anyone who travels across state lines to operate a house of prostitution is susceptible to arrest by local authorities. This does not in any manner alter the fact that such a person may also violate the Travel Act, and no application of "judicial gloss," defendants' oft repeated term, can make New York State and federal jurisdiction mutually exclusive.

We believe the nature of the interstate activity shown in this case justifies conviction under the Travel Act. This is not a situation in which a purely local crime acquired an interstate flavor merely because its victim chose to write a check rather than borrow money from his associates, as in *Altobella*. This is not a situation in which a check, written by an Illinois resident, and drawn on and deposited in Illinois banks, entered Missouri merely because of the fortuitous use of the Federal Reserve System, as in *United States v. Isaacs*, 493 F.2d 1124 (1971), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Nor is this a situation in which relatively minor state

offenses would be transformed into federal felonies on the basis of the geographic origin of customers.

The defendants also argue that if the Travel Act prohibits them from travelling from their residences in New Jersey to New York to promote prostitution, it is violative of Article IV, Section 2, and the Fourteenth Amendment of the Constitution. The constitutionality of Section 1952 has been repeatedly and unsuccessfully challenged. *See e. g. United States v. Villano, supra*, at 1046; *United States v. Lookretis*, 422 F.2d 647 (7th Cir.), *cert. denied*, 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970); *United States v. Barrow, supra*, at 65; *United States v. Zizzo*, 338 F.2d 577 (5th Cir. 1964); *United States v. Corallo*, 281 F.Supp. 24 (S.D.N.Y.1968). Neither Article IV, Section 2 nor the Fourteenth Amendment acts as a prohibition of Congress' authority to regulate interstate activities under the Commerce Clause. (*Cf. United States v. Villano, supra; United States v. Barrow, supra.*) That authority extends as much to regular commutation across state lines on a daily basis as to a transcontinental journey. *Cf. United States v. Lee, supra.*

The defendants' argument is even less appealing when viewed in the light of other evidence showing the use of interstate facilities in addition to the daily travel of the defendants, *e. g.* interstate telephone calls by Victor to a New Jersey prostitute who crossed state lines on a daily basis to work for him, a business-related interstate call to Carlos, and telephone records of hundreds of interstate calls between each of the defendants three condominiums and their house of prostitution.

### Constitutionality of New York Statute Prohibiting Prostitution

The defendants urge their convictions under the Travel Act be reversed because the New York statute prohibiting prostitution (N.Y. Penal Law § 230.00. McKinney's

1972)[2] is unconstitutional as violative of the Fourteenth Amendment in that it is vague and overbroad in failing to give adequate notice of the nature of the prescribed act, and also that it is violative of the First, Ninth and Fourteenth Amendments in that it constitutes an invasion of an individual's "privacy" rights. They argue that since a state law violation is an element of their Travel Act convictions, they should be permitted to challenge the constitutionality of that state law. See *United States v. Kahn*, 472 F.2d 272, 277 (2nd Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

■■■■ The constitutionality of a statute is to be considered in the light of the standing of the party who seeks to raise the question and of its particular application. *Long v. Somervell*, 175 Misc. 119, 22 N.Y. S.2d 931 (1940), *aff'd*, 261 App.Div. 946, 27 N.Y.S.2d 445. It is firmly established that the constitutionality of a statute may not be attacked by one whose rights are not, or are not about to be, adversely affected by the operation of the statute. *Alabama State Federation of Labor, Local Union No. 103, United Brotherhood of Carpenters and Joiners of America v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Wilner v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Board of Trade of City of Chicago v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923); *Gallup v. Schmidt*, 183 U.S. 300, 22 S.Ct. 162, 46 L.Ed. 207 (1902). To raise the question he must show that the alleged unconstitutional feature of the statute injures him, and so operates as to deprive him of a constitutional right. *Gange Lumber Co. v. Rowley*, 326 U.S. 295, 66 S.Ct. 125, 90 L.Ed. 85 (1945); *Coffman v. Breeze Corp.*, 323 U.S. 316, 65 S.Ct. 298, 89

L.Ed. 264 (1945); *Voeller v. Neilston Warehouse Co.*, 311 U.S. 531, 61 S.Ct. 376, 85 L.Ed. 322 (1941); *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Aikens v. Kingsbury*, 247 U.S. 484, 38 S.Ct. 558, 62 L.Ed. 1226 (1918). It is, of course, a prerequisite that he establish in himself the claimed right which is alleged to be infringed. *Wissner v. Wissner*, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950), rehearing denied 339 U.S. 926, 70 S.Ct. 619, 94 L.Ed. 424 (1950). A person ordinarily is precluded from challenging the constitutionality of statutes invoking the rights of others. *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) rehearing denied, 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361 (1953). It must affirmatively appear that the person attacking the statute comes within the class of persons affected by it. *United States v. Barrows, supra; Alabama State Federation of Labor, Local Union No. 103, United Brotherhood of Carpenters and Joiners of America v. McAdory, supra; Tennessee Electric Power Co. v. Tennessee Valley Authority, supra; Heald v. District of Columbia*, 259 U.S. 114, 42 S.Ct. 434, 66 L.Ed. 852 (1922).

■■■■ The defendants thus lack standing to attack the statute vicariously by asserting grounds not personal to them and arguing that it could be applied to hypothetical persons engaging in hypothetical conduct in such a way as to render it unconstitutionally vague or by invoking the alleged "privacy rights" of prostitutes and their customers as constituting a violation of the defendants' First, Fourth and Fourteenth Amendment rights. The defendants only have standing under the Due Process clause of the Fourteenth Amendment to challenge the definition of prostitution as being unconstitutionally vague in the context of its

2. The defendants by operating a prostitution enterprise violated not Section 230.00 of the New York Penal Law which they address in their brief, but Sections 230.20, 230.25 and 230.30 which prohibit promoting prostitution in the third, second and first degree respectively. The substantive crime of prostitution itself is defined as follows:

"A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee." N.Y. Penal Law § 230.00 (McKinney's 1972)

application to them, thereby presenting the question whether or not it can reasonably be foreseen from a reading of the statute that the conduct of which the defendants were accused is proscribed.

It is settled that the fair warning requirement embodied in the Due Process clause of the Fourteenth Amendment prohibits the states from holding an individual "criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Wainwright v. Stone,* 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). This prohibition against excessive vagueness does not, however, invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for "in most English words and phrases there lurk uncertainties." *Robinson v. United States,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945). All the Due Process clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope.[3] Even in criminal cases where the vagueness standard is more stringently applied, the statute must only present "ascertainable standards of guilt." *Winters v. People of State of New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1944); *United States v. Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

We have little doubt that the New York statute is not so vague that "men of common intelligence must necessarily guess at its meaning." *Connelly v. General Construction Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d

222 (1972). We do not believe that the defendants were "required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. State of New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). The New York statute clearly places men of reasonable intelligence on notice that they cannot promote prostitution. The definition of prostitution as being a person who engages or agrees or offers to engage in sexual conduct with another person in return for a fee is not so vague as to make persons of common intelligence guess at its meaning. Although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that can be sufficiently understood and complied with by the ordinary person exercising ordinary common sense. Moreover, even if the outermost boundaries of the statute may be imprecise, any such uncertainty has little relevance here where the defendants' conduct falls squarely within the "hard core" of the statute's proscriptions. *See Broadrick v. Oklahoma, supra; Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951); *Robinson v. United States,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945); *United States v. Wurzbach,* 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1934).

In *People v. Costello,* 90 Misc.2d 431, 395 N.Y.S.2d 139 (Sup.Ct.N.Y.Cty.1977), Costello's argument that his conviction for promoting prostitution should be set aside because the phrases "sexual conduct" and "fee" are unconstitutionally vague was rejected by the court. We believe the statute establishes standards of guilt, at least as definite as those which withstood the same constitutional challenge in *People v. Capparelli,* 29 A.D.2d 1000, 289 N.Y.S.2d 499 (1968), affirmed, 25 N.Y.2d 832, 303 N.Y. S.2d 685 (1969); and in *Rose v. Locke, supra,* and, accordingly, is constitutional.

**3.** This is not a case in which the statute threatens a fundamental right such as freedom of speech so as to call for any special judicial scrutiny. *See Rose v. Locke, supra; Broadrick*

*v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

**1150**

*The Court's Instructions to the Jury*

The defendants assert that the trial court erred in failing to charge that the co-conspirators must agree to violate the specific federal statutes with which they were charged, and also in failing to charge the jury that they must find a specific agreement by the defendants to utilize facilities of interstate commerce. These contentions are without merit.

 Where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a *mens rea* requirement, such knowledge is equally irrelevant to questions of responsibility for conspiring to commit this offense. The general conspiracy statute (18 U.S.C. § 371) makes it unlawful to "conspire * * * to commit any offense against the United States." Since one can violate a criminal statute merely by engaging in the forbidden conduct, a conspiracy to commit that offense is nothing more than an agreement to engage in the prohibited conduct. The concept of criminal intent does not extend so far as to require that the person doing the forbidden acts understands not only the nature of his acts but also its consequence for the choice of a judicial forum. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Viruet,* 539 F.2d 295 (2nd Cir. 1976); *United States v. Green,* 523 F.2d 229 (2nd Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). *See also United States v. Jermendy,* 544 F.2d 640 (2nd Cir. 1976).

 Substantive cases brought under § 1952 have been uniform in their holdings that it is unnecessary to prove a defendant had actual knowledge of the jurisdictional element, and that he actually agreed and intended to use interstate facilities to commit a crime. *See United States v. Villano,* 529 F.2d 1046, 1054 (10th Cir. 1976); *United States v. Peskin,* 527 F.2d 71, 78 (7th Cir. 1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); *United States v. Sellaro,* 514 F.2d 114, 120–21 (8th Cir. 1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *United States v. LeFaivre,* 507 F.2d 1288 (4th Cir. 1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Therefore, to prove a conspiracy to violate § 1952 the government need not establish that the defendants agreed or intended to use facilities of interstate commerce. *See United States v. Feola, supra.*

The district court correctly instructed the jury with respect to conspiracy, except that it failed to charge the jury that in order to convict the defendants on conspiracy to violate a particular statute they must find that the defendants agreed to perform the acts that are prohibited by that statute. The law of conspiracy requires the same *mens rea* as would be required to support a conviction for a substantive violation. This error, a ground not advanced by the defendants, was harmless because all defendants received concurrent sentences and their conviction under Count 1 of conspiracy does not add materially to the pains and penalties they will suffer on convictions under Counts 2 and 3. In addition, the district court did correctly charge the jury concerning the *mens rea* necessary to support convictions of the substantive offenses under Counts 2 and 3. The jury convicted on both of these substantive offenses and in so doing necessarily found an agreement to do the acts that are prohibited by each of these statutes. Thus, they implicitly would have found the same agreement by the defendants in deliberating the conspiracy charge and a correction of the court's error would not have changed the outcome.

This lengthy discourse should convince the disinterested reader, if not the defendants themselves, that they were not prejudiced by the district court's denial of their misjoinder motion; that there was overwhelming evidence of the defendants' guilt; that their various challenges to the Travel Act and to the New York statute prohibiting prostitution have no merit; and that there was no reversible error in the trial court's charges to the jury.

The judgments of conviction are AFFIRMED.