**UNITED STATES of America, Plaintiff,**

v.

**Rita GLUZMAN, Defendant.**

**No. 96 Cr. 323 (BDP).**

United States District Court,
S.D. New York.

Jan. 17, 1997.

Cathy Seibel, Diedre M. Daly, Asst. U.S. Attys., White Plains, NY, for U.S.

Lawrence Hochheiser, Michael Rosen, Diarmund White, New York City, for Defendant.

PARKER, District Judge.

[1] On April 25, 1996, defendant Rita Gluzman ("Gluzman") was indicted for conspiring to commit interstate domestic violence and for committing interstate domestic violence in violation of 18 U.S.C. § 2261 (1996).[1] Gluzman moves to dismiss the indictment on the ground that Congress, when it enacted section 2261, exceeded its authority under the Commerce Clause. *See* U.S. Const., Art. I, § 8, cl. 3. For the reasons stated below, I find the challenged provision to be a constitutional exercise of Congress' power to regulate interstate commerce. Accordingly, the motion to dismiss is denied.

## BACKGROUND

The facts as alleged by the government are as follows.[2] In the late morning of April 7, 1996, Police Officer Richard Freeman happened upon Vladimir Zelenin dumping the body parts of Yakov Gluzman, Rita Gluzman's husband, into the Passaic River in New York near ECI Techonolgy, Inc. ("ECI"), a company co-owned by Rita and Yakov Gluzman. Upon this inadvertent discovery, Zelenin, after being advised of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), confessed that he, with the help of his cousin Rita Gluzman, had murdered Yakov Gluzman.

According to Zelenin, an employee of ECI, Gluzman approached him approximately one month earlier to enlist him in the murder of her estranged husband. Apparently, Gluzman told Zelenin that she and her husband were undergoing divorce proceedings as a result of which ECI would shut down and Zelenin would lose his job. Zelenin agreed to assist Gluzman in the murder.

On April 5, 1996, Gluzman allegedly told Zelenin that she wanted to kill her husband the next day, before her husband came to her house to collect some of his belongings. Zelenin stated that on the appointed day, April 6, 1996, he met Gluzman in New Jersey and drove with her to Pearl River, New York, to commit the murder, armed with an ax and a knife. Once in Pearl River, they entered Yakov Gluzman's apartment and awaited his return. When he arrived, Gluzman and Zelenin killed him together. Zelenin then dismembered the body while Gluzman cleaned the apartment of traces of the crime.

Zelenin admits to placing Yakov Gluzman's body parts into plastic bags, which were then loaded into the trunks of a Ford Taurus registered to ECI and Yakov Gluzman's Nissan Maxima. Gluzman and Zelenin drove the two cars to the ECI parking lot, after which Zelenin drove Gluzman to her home in Upper Saddle River, New Jersey. They allegedly agreed that Zelenin would return to ECI and dump the bags filled with Yakov Gluzman's body parts into the nearby Passaic River and then meet later that day at ECI. The discovery of Zelenin by Freeman and Zelenin's subsequent arrest prevented this later rendezvous.

Gluzman disappeared after the murder. On April 12, 1996, personnel at the Cold Spring Harbor Laboratory ("the Laboratory") in Long Island, New York, discovered a

---

1. Additional charges were brought against Gluzman in superseding indictments dated October 31, 1996, November 14, 1996, and December 12, 1996. Those indictments added charges of illegal interception of oral communications in violation of 18 U.S.C. §§ 2511(1)(a), 2511(4)(a); use of a device to intercept oral communication in violation of 18 U.S.C. §§ 2511(1)(b), 2511(4)(a), and travel in furtherance of extortion in violation of 18 U.S.C. § 1952.

2. This factual background is gleaned from the complaint filed against Gluzman on April 18, 1886, the affidavits submitted in support of the search warrants of Gluzman's residence and ECI Technology, Inc., a company owned by Gluzman, and the April 25, 1996 indictment.

trespasser in a cottage on the premises. When Arthur Brings, director of facilities at the Laboratory, approached the trespasser, he recognized her as Rita Gluzman, who he knew from past work-related visits that she and her husband had made to the Laboratory. Later that day, Gluzman was arrested by the Nassau County authorities and charged with burglary of the Laboratory cabin. On April 18, 1996, Gluzman was arrested by federal agents and charged in a federal complaint with conspiracy to violate and a substantive violation of 18 U.S.C. § 2261.

On April 25, 1996, a grand jury returned a two count indictment against Gluzman, charging her with conspiracy to commit interstate domestic violence and the commission of interstate domestic violence. Specifically, the indictment charges that Gluzman both conspired to, and actually did, travel from New Jersey to New York with the intent to murder her estranged husband, and that, once in New York, she murdered him, in violation of 18 U.S.C. § 2261.

Gluzman subsequently brought this motion to dismiss her indictment arguing that section 2261 neither regulates a commercial activity nor contains a requirement that the activity in question be connected to interstate commerce, and therefore its enactment exceeded the authority of Congress to legislate under the Commerce Clause. Gluzman argues that the legislative history of 18 U.S.C. § 2261 does not support Congress' authority to enact the section under the Commerce Clause. She further argues that Congress is limited, under its Commerce powers, to regulating only those activities that have an economic component or that implicate some other attribute of commerce. Consequently, according to Gluzman, the interstate conduct prohibited by section 2261 falls beyond Congress' authority.

## DISCUSSION

Since one of Gluzman's principle arguments is that section 2261 is unsupported by its legislative history, we begin with an examination of the pertinent Congressional findings. In September 1994, Congress passed the Violence Against Women Act of 1993 ("VAWA") as part of the larger Violent Crime Control and Law Enforcement Act of 1994, P.L. 103–322; see S.Rep. No. 103–138, at 38 (1993). Section 221, Title II of the VAWA (codified as 18 U.S.C. § 2261) contains the challenged provision, which makes it a crime for a person to travel across a state line "with the intent to injure, harass, or intimidate that person's spouse or intimate partner," and "in the course of or as a result of such travel [to] intentionally commit[ ] a crime of violence caus[ing] bodily injury to such spouse or intimate partner." 18 U.S.C. § 2261(a)(1).

The legislative history of the VAWA contains little express consideration of section 2261 and the impact on interstate commerce of traveling across state lines to commit domestic violence. In its discussion of the VAWA generally, however, Congress noted that "[o]ur society pays a heavy price for [domestic] violence: 1 million women a year seek medical attention for injuries caused by violence at the hands of a male partner, children in homes with family violence are 15 times more likely to be abused or neglected than children in peaceful homes; and finally, estimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S.Rep. No. 103–138, at 41.

In describing the purpose of section 2261, Congress did note that it served to fill the "[g]aps in the legal protection offered to victims of domestic violence ... [where] States and localities have not addressed the issue sufficiently." S.Rep. No. 103–138, at 43. The Committee on the Judiciary further stated that it believed that the provisions in section 2261 "constitute an appropriate response to the problem[s] of domestic violence which, because of their interstate nature, transcend the abilities of State law enforcement agencies. The committee's legislation does not constitute an 'overfederalization' of crimes. Under title 18 of the United States Code, there are provisions that make it a crime to cross a State line with falsely made dentures or with a cow." S.Rep. No. 103–138, at 62.

Gluzman argues, nonetheless, that the legislative history of 18 U.S.C. § 2261 fails to indicate that the statute as finally enacted was based on any findings in that history

that the interstate travel in furtherance of spousal abuse was activity that affected interstate commerce. She further contends that section 2261 neither regulates a commercial activity nor contains a requirement that the activity in question be connected to interstate commerce, and therefore its enactment exceeded the authority of Congress to legislate under the Commerce Clause.

■ The challenged statutory provision arose in an area which Congressional power is exceedingly broad. Indeed, the power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824). Thus, "the task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981).

■ While a court's inquiry when examining the constitutionality of a congressional enactment is an independent one, the court will consider congressional findings, including congressional committee findings. *United States v. Lopez,* 514 U.S. 549, ——, 115 S.Ct. 1624, 1631, 131 L.Ed.2d 626 (1995). Where the court determines that the legislators, "in light of facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce," the court's investigation is completed. *Katzenbach v. McClung,* 379 U.S. 294, 303–04, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964); *see also Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

■ Review of the legislative history of the section, though sparse, indicates that Congress had a rational basis for concluding that the regulation of interstate domestic violence was "reasonably adapted to [an] end permitted by the Constitution." *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360. Congress, in enacting section 2261, alluded to the substantial toll of domestic violence on the physical and economic welfare of individuals directly affected by such violence as well as public generally. *See* S.Rep. No. 103–138 at 41. Although gender-based violence, particularly when it is targeted against women, was clearly of primary concern to Congress, it was not the exclusive motive for the VAWA in its entirety. As previously noted, when addressing section 2261, the Committee considered, in nongender specific terms, "the health care, criminal justice, and other social costs of domestic violence," S.Rep. No. 103–138, at 41, and crafted what it believed to be an "appropriate response to the problem[s] of domestic violence which, because of their interstate nature, transcend the abilities of State law enforcement agencies." S.Rep. No. 103–138, at 62.

■ Having determined that a rational basis exists, "the only remaining question for judicial inquiry is whether the 'means chosen by [Congress] [are] reasonably adapted to the end permitted by the Constitution.'" *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360 (quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)). Gluzman suggests that the Supreme Court's recent decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, compels the conclusion that they are not.

In *Lopez,* the Supreme Court invalidated the Gun–Free School Zones Act, 18 U.S.C. § 922(q), which prohibited possession of a firearm in a school zone, as beyond the scope of the Commerce Clause. In defining the contours of the Commerce Clause, the *Lopez* Court identified three broad categories of activity that Congress may regulate under its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce or persons or things in interstate commerce, even though the threat comes only from intrastate activity; and (3) intrastate activities that have a substantial relation to interstate commerce. *Lopez,* 514 U.S. at —— ——, 115 S.Ct. at 1629–30.

*Lopez* held that Congress, in enacting 18 U.S.C. § 922(q), exceeded its authority under the Commerce Clause by failing to incorporate a jurisdictional element requiring a commerce nexus and by attempting to regulate local, non-economic activity. *Id.* at —— ——

——, 115 S.Ct. at 1630–31. *Lopez,* however, was concerned only with the third category of activity, and did not purport to affect Congress' exercise of its commerce power with regard to the regulation of the use of the channels or instrumentalities of commerce.

Unlike the statute at issue in *Lopez,* section 2261 does not regulate purely local activity, but, instead, is an exercise of Congress' power under the first category of cases articulated by the *Lopez* Court—the authority to regulate the use of channels of commerce.[3] Furthermore, the section clearly requires an identifiable interstate nexus, namely, the crossing of a state line with the criminal intent to commit domestic violence against one's spouse and the actual commission of such violence. *See* 18 U.S.C. § 2261(a). Section 2261 therefore avoids the constitutional deficiencies identified in *Lopez* where the interstate nexus was non-existent and the activity to be regulated was purely local. Thus, whatever limitation *Lopez* may have recognized with respect to congressional power over intrastate activities that may affect commerce, the decision did not speak to the broad power of Congress to regulate the channels of interstate commerce, an area occupied by section 2261 as well as numerous other criminal statutes. *See, e.g.,* 18 U.S.C. § 1073 (criminalizing travel in interstate commerce to avoid prosecution); 18 U.S.C. § 1201 (criminalizing kidnaping if the victim is transported in interstate commerce); 18 U.S.C. § 1952 (prohibiting travel in interstate commerce to carry on certain specified unlawful activities including, *inter alia,* extortion, bribery or arson); 18 U.S.C. § 2314 (prohibiting the transportation or transfer in interstate commerce of stolen property).

Congress' authority "to keep the channels of interstate commerce free from immoral or injurious uses has been frequently sustained, and is no longer open to question." *Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. at 357 (quoting *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917)). Thus, courts consistently have upheld federal criminal statutes that regulate the crossing of state lines by persons or things in a manner incident to some criminal activity. *See, e.g., Scarborough v. United States,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (holding that under 18 U.S.C. § 1202(a), a statute criminalizing possession "in interstate commerce or affecting commerce" of a firearm by a convicted felon, proof that the possessed firearm previously traveled in interstate commerce was sufficient to satisfy the required nexus between possession and commerce); *United States v. Hernandez,* 85 F.3d 1023, 1031 (2d Cir.1996) (upholding Comprehensive Drug Abuse Prevention and Control Act of 1970, 18 U.S.C. § 922(g)(1) and 922(k), which criminalize possession of firearms by felons where the weapon at issue was shipped or transported in interstate or foreign commerce); *United States v. Sirois,* 87 F.3d 34 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 328, 136 L.Ed.2d 241 (1996) (upholding statute, 18 U.S.C. § 2251(a), penalizing a pornographer if "such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce").

Gluzman contends, nonetheless, that Congress exceeded the scope of its authority under the Commerce Clause by attempting to regulate an activity that was not commercial. According to the defendant, for statutory enactments under *Lopez* categories one and two to pass constitutional muster, such regulations must involve "economic activity" or must expressly require movement "in interstate commerce" as grounds for jurisdic-

**3.** Only two other courts have considered the constitutionality of provisions of the VAWA. One challenge was successful, the other was not. *See Brzonkala v. Virginia Polytechnic and State University,* 935 F.Supp. 779 (W.D.Va.1996) (holding that Title III of the VAWA, 42 U.S.C. § 13981, is an unconstitutional exercise of Congress' power under the Commerce Clause and the Enforcement Clause of the Fourteenth Amendment); *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996) (upholding the constitutionality of 42 U.S.C. § 13981).

Both cases, however, deal exclusively with Title III of the VAWA, 42 U.S.C. § 13981, which creates a civil rights remedy for gender-based violence. Section 13981, as both the *Brzonkala* and *Doe* courts recognize, regulates purely intrastate activity and therefore differs analytically from 18 U.S.C. § 2261, which regulates an interstate activity, namely the travel across state lines to commit domestic violence. *See* 18 U.S.C. § 2261.

tion. In other words, in order to affect the channels of interstate commerce as a basis for regulation, the conduct sought to be criminalized must involve the transportation of something—e.g. pornography or goods— from state to state or at a minimum some other commercial activity that has a clearly identifiable connection with commerce.

While these contentions might carry some weight if the analysis concerns whether local activities substantially affect interstate commerce, they are wide of the mark where, as here, the statute regulates conduct *in* interstate commerce. Five days after *Lopez* was decided, in *United States v. Robertson,* 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (per curiam), the Supreme Court reaffirmed the distinction between activities *in* interstate commerce and local activities that substantially *affect* interstate commerce. There, the Court concluded that it was not necessary to prove that an Alaskan gold mine "affect[ed]" interstate commerce to bring it under the Racketeer Influenced and Corrupt Organizations Act (RICO); it was sufficient merely to prove that the gold mine was an "enterprise ... engaged in ... interstate or foreign commerce." *Id.* at ——, 115 S.Ct. at 1733. The Court made clear that "[t]he 'affecting commerce' test was developed [ ] to define the extent of Congress' power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effect." *Id.* The Court upheld the RICO conviction based on "the *inter* state activities of Robertson's mine," without considering its local activities. *Id.*

As the Ninth Circuit recently stated, the Supreme Court in *Robertson* "explained that the[ ] three bases of congressional authority [identified in *Lopez* ] are analytically distinct." *United States v. Pappadopoulos,* 64 F.3d 522, 526 (9th Cir.1995). Thus, to the extent that Congress seeks to regulate persons or things *in* interstate commerce—as opposed to local activities that *affect* interstate commerce—its power to do so was not changed by *Lopez.*

 It has long been established that Congress can not only regulate activities that involve interstate or international transportation of goods and people, but it can do so

"regardless of whether the transportation is motivated by a 'commercial purpose.'" *Sirois,* 87 F.3d at 40 (citing *United States v. 12,200-Ft. Reels of Super 8MM Film,* 413 U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973)). Indeed, the regulated activity need not even be commercial in character. *Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. at 356–57; *Hoke v. United States,* 227 U.S. 308, 320, 33 S.Ct. 281, 283, 57 L.Ed. 523 (1913). "Transactions [may] be commerce though non-commercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electron and information." *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 549–50, 64 S.Ct. 1162, 1172, 88 L.Ed. 1440 (1944). Congress has long exercised the authority to keep the channels of interstate commerce free from injurious noncommercial uses, including, among others, the transportation of firearms for private use, *Scarborough,* 431 U.S. 563, 97 S.Ct. 1963, pornography for private use, *Sirois,* 87 F.3d 34, liquor for private use, *United States v. Hill,* 248 U.S. 420, 39 S.Ct. 143, 63 L.Ed. 337 (1919), and obscene materials for private use. *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). Thus, the Supreme Court has held that the Commerce Clause empowers Congress to prohibit the importation of obscene material from abroad, even if it is imported for personal use rather than commercial distribution. *See 12200–Ft. Reels of Super 8 MM Film,* 413 U.S. 123, 93 S.Ct. 2665. The Court has also upheld the Mann Act's application to interstate transportation of persons for an immoral purpose—polygamy—on the ground that the statute, "while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, is not restricted to that end." *Cleveland v. U.S.,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946).

Moreover, this Court cannot glean, as Gluzman urges, any principled distinction between Congress' power to prohibit one from transporting an article or another person and its power to prohibit the use of commerce by the illegal actor herself. Indeed, statutes regulating persons who cross state lines har-

boring the intent to commit an unlawful activity have consistently been upheld as within Congress' authority under the commerce clause.

For example, the Travel Act, 18 U.S.C. § 1952, which makes it a crime to use an interstate facility with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity," has long been upheld as well within Congress' authority to legislate under the Commerce Clause. *See, e.g., United States v. Herrera*, 584 F.2d 1137, 1147 (2d Cir.1978) (noting that the constitutionality of section 1952 has been repeatedly and unsuccessfully challenged); *United States v. Barrow*, 363 F.2d 62 (3d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *United States v. Zizzo*, 338 F.2d 577 (7th Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965); *United States v. Goldberg*, 928 F.Supp. 89, 94–98 (D.Mass. 1996); *see also Hemans v. United States*, 163 F.2d 228 (6th Cir.), *cert. denied*, 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380 (1947) (upholding the Fugitive Felon Act, which made unlawful the travel in interstate commerce with the intent to avoid prosecution); *United States v. Boone*, 904 F.Supp. 866 (N.D.Ind.1995) (upholding 18 U.S.C. § 924(m), which prohibits an individual from "travel[ing] from any State or foreign country into any other State" in an attempt to illegally deal in firearms, as a valid exercise of congressional authority under the Commerce Clause). Considering the plenary power afforded to Congress to regulate the channels of interstate com-

merce, section 2261 certainly falls within the categories of activity that Congress may properly regulate.

■ Section 2261 has the requisite relation to interstate commerce as defined under controlling law since it is triggered only if an individual crosses a state line with the intent to injure, harass, or intimidate his or her spouse or intimate partner, and that travel actually results in the intentional commission of a crime of violence that causes bodily injury to such spouse or intimate partner. *See* 18 U.S.C. § 2261. As was previously noted, it is a "well settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether physical, moral, or economic in nature." *North Am. Co. v. SEC*, 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946).[4]

Gluzman's final argument attacks section 2261 as overbroad, pointing to the legislative history's myriad references to violence against women and the absence of any such references to problems associated with violence against men. She argues that to the extent that gender-based violence does have a genuine effect on interstate commerce, those findings are relevant only to 42 U.S.C. § 13981, which establishes a civil rights remedy for gender-based violence. Thus, according to the defendant, 18 U.S.C. § 2261, insofar as it applies to protect "spouses" and is gender neutral, reaches beyond the scope of congressional findings with regard to the

---

**4.** Gluzman further argues that, in the event that violence against women were determined to provide Commerce Clause jurisdiction, section 2261 could not apply to acts of violence against a husband, and the indictment, in this case, would thus have to be dismissed. In determining the scope of a statute, a court must "look first to [the statute's] language. If the statutory language is unambiguous, in the absence of a 'clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)). Gluzman's argument ignores the plain

language of section 2261 which criminalizes interstate travel with the intent to injure a "spouse" or "intimate partner." The statute is decidedly gender neutral. Only a "'clearly expressed legislative intention' contrary to the . . . [statutory] language, . . . would require [the court] to question the strong presumption that Congress expresses its intent through the language it uses." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 433, n. 12, 107 S.Ct. 1207, 1214, n. 12, 94 L.Ed.2d 434 (1987). No such contrary language is present in this case. The legislative history recognizes that women are the "most likely target" of gender-based violence, S.Rep. 103–138 at 54, but does not exclude men as potential victims.

effect of gender-based violence on interstate commerce.

Gluzman fails to recognize, however, that in order to succeed in a facial challenge to section 2261, she "must show that 'no set of circumstances exists under which the [section] would be valid.'" *United States v. Sage,* 92 F.3d 101, 106 (2d Cir.1996) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); *see Giusto v. I.N.S.,* 9 F.3d 8, 10 (2d Cir.1993). Thus, even if this Court were to find that section 2261 is unconstitutional as so far as it fails to regulate nongender motivated activity, it would be "insufficient to render the [section] wholly invalid, since the [Supreme] Court has not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Sage,* 92 F.3d at 106 (citing *General Electric v. New York State Dep't of Labor,* 936 F.2d 1448, 1456 (2d Cir.1991)).

## CONCLUSION

Based on the above reasons, this Court finds that 18 U.S.C. § 2261 is a constitutional exercise of Congress' power to regulate commerce. Accordingly, the motion to dismiss the indictment is denied.

**SO ORDERED.**