**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Derek Duane PAGE, Defendant– Appellant.**

No. 96–4083.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 23, 1998.

Decided Feb. 23, 1999.

Thomas M. Tyack (argued and briefed), Tyack, Blackmore & Liston, Columbus, Ohio, for Defendant–Appellant.

Deborah A. Solove (argued and briefed), Office of the U.S. Attorney, Columbus, Ohio, Terry W. Lehmann (briefed), Office of the U.S. Attorney, Cincinnati, Ohio, for Plaintiff–Appellee.

Before: MARTIN, Chief Judge; MERRITT, KENNEDY, WELLFORD, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

## ORDER

PER CURIAM.

■ The en banc court is equally divided in this case. Eight members of the court[1] favor affirmance of the district court and join in Judge Moore's concurring opinion (pp. 326–336). Seven members of the court[2] agree with Judge Kennedy's dissent (pp. 336–338) and would reverse; Judge Ryan, writing separately (p. 338), would also reverse; Judge Wellford would reverse for the reasons stated in his separate opinion (pp. 338–340) as well as those stated in the opinions of Judges Kennedy and Ryan. Hence, as is customary under such circumstances, the appellant's conviction and sentence are affirmed by an equally divided vote.

MOORE, Circuit Judge, concurring in the order.

As a response to the "escalating problem of violence against women" and in recognition of the severe toll such crimes have on our society in terms of "health care, criminal justice, and other social costs," Congress enacted in 1994 the Violence Against Women Act ("VAWA" or the "Act"). S.REP. No. 103–138, at 37, 41 (1993) (proposed VAWA of 1993); see Pub.L. No. 103–322, 108 Stat. 1796, 1902–55 (1994). Among numerous other provisions, the Act criminalized interstate domestic violence and interstate violation of protection orders. See VAWA § 40221(a), 108 Stat. at 1926–31, 18 U.S.C. §§ 2261, 2262. While Congress was particularly concerned with those crimes that "disproportionately burden women," S.REP. No. 103–138, at 37, the criminal provisions are gender-neutral, and enforcement has been gender-neutral as well. See, e.g., United States v. Gluzman, 953 F.Supp. 84 (S.D.N.Y.1997) (upholding the indictment of a wife for the murder of her estranged husband in violation of 18 U.S.C. § 2261), aff'd, 154 F.3d 49 (2d Cir.1998).

Derek Page, the defendant in this case, was convicted under 18 U.S.C. § 2261(a)(2), which makes it illegal for any person to "cause[ ] a spouse or intimate partner to cross a State line ... by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commit[ ] a crime of violence and thereby cause[ ] bodily injury to the person's spouse or intimate partner."[1] On appeal, he raises the questions whether physical violence that occurs before interstate travel begins can satisfy the "in the course ... of that conduct" requirement of § 2261(a)(2) and whether a threat of violence that results in the aggravation of pre-existing injuries can be a "crime of violence" causing "bodily injury" for purposes of the statute. I would answer both questions in the affirmative and conclude that there was sufficient evidence for the jury to convict Page under either theory. Finally, I would reject Page's argument that § 2261(a)(2) is unconstitutional and hold that the statute is a constitutional exercise of Congress's power to regulate interstate commerce.

## I. BACKGROUND

The facts of this case are not unlike the stories of many women who attempt to leave

---

1. Chief Judge Martin and Judges Boggs, Siler, Daughtrey, Moore, Cole, Clay, and Gilman.

2. Judges Merritt, Kennedy, Wellford, Nelson, Norris, Suhrheinrich, and Batchelder.

1. The full text of § 2261(a) is:
   § 2261. Interstate domestic violence
   (a) Offenses.—
   (1) Crossing a State line.—A person who travels across a state line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a

crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b).
   (2) Causing the crossing of a State line.—A person who causes a spouse or intimate partner to cross a State line or to enter or leave Indian country by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner, shall be punished as provided in subsection (b).
   18 U.S.C. § 2261(a).

abusive relationships. Carla Scrivens's relationship with Page started out on fairly blissful terms. Joint Appendix (J.A.) at 302–03 (Scrivens Test. at 395–96). Yet, Page soon became controlling, possessive, and even physically abusive, demanding that Scrivens stop associating with her friends and family, controlling what she could wear and eat, and on one occasion even punishing her disobedience with a stun gun and mace. J.A. at 303–07 (Scrivens Test. at 396–400). In light of the deterioration of their relationship, after less than three months together, Scrivens told Page that she was moving out and ending their relationship. J.A. at 293–95, 310–311 (Scrivens Test. at 376–78, 408–09).

The planned attack against Scrivens took place when she attempted to retrieve her belongings, all of which were still in Page's condominium in Columbus, Ohio. J.A. at 310–19, 338 (Scrivens Test. at 408–21, 440). Upon Scrivens's arrival, Page pushed her down, dragged her away from the door when she attempted to leave, and tried to spray her with mace. J.A. at 316–17, 322 (Scrivens Test. at 418–19, 424). He then beat her with his fists, a claw hammer, and a pipe wrench over the course of several hours. J.A. at 317–23 (Scrivens Test. at 419–25). Scrivens also testified that Page used a stun gun during the assault. J.A. at 318–21 (Scrivens Test. at 420–23). After the beating, Page carried his victim, who could not walk on her battered feet and legs and who had fallen into unconsciousness several times during the attack, and placed her into his car under threat of further violence from his stun gun. J.A. at 326 (Scrivens Test. at 428). Page then drove around for approximately four hours, crossing state lines through West Virginia into Pennsylvania and intentionally passing several local hospitals on the way even though Scrivens pleaded with him to stop for medical treatment at either Riverside or Ohio State University, two hospitals in the Columbus area. J.A. at 223–24, 324–26, 332 (Scrivens Test. at 167–68, 426–28, 434). During this time, Scrivens continued to bleed, and painful swelling from her injuries increased. J.A. at 215, 335, 338 (Friend Test. at 159, Scrivens Test. at 437, 440). Page eventually left her at a hospital in Washington, Pennsylvania, where, after she realized that Page would not return, Scrivens

told emergency room personnel that Page had attacked her and agreed to report the incident to the police. J.A. at 225–27, 340 (Friend Test. at 169–71, Scrivens Test. at 442).

Page was charged with kidnaping and interstate domestic violence. After his first trial resulted in a hung jury, a second jury acquitted him of kidnaping under 18 U.S.C. § 1201 and convicted him of interstate domestic violence under 18 U.S.C. § 2261(a)(2). The district court rejected Page's argument, in his post-verdict motion for a judgment of acquittal, that there was insufficient evidence to support the verdict because the statute does not (and, constitutionally, may not) reach violence that occurs before travel begins. A divided panel of this court reversed, holding that Page could be convicted under § 2261(a)(2) only for violence committed during the time in which he and Scrivens were actually traveling in the car. *See United States v. Page*, 136 F.3d 481, *vacated*, 143 F.3d 1049 (6th Cir.1998). Concluding that the jury improperly had been permitted to consider the attack inside the condominium as the "crime of violence" underlying the interstate domestic violence charge, the panel remanded for a new trial. *See id.*, 136 F.3d at 488. We granted rehearing en banc and now affirm by an equally divided vote.

## II. STATUTORY SCOPE

Page's conduct, as presented to the jury, falls within the scope of § 2261(a)(2) under at least two theories of liability. The evidence showed that he committed interstate domestic violence both: (1) when, by beating his ex-girlfriend into a state of semi-consciousness over the course of several hours, he was enabled to and did force her across state lines against her will in an attempt to evade the law, and (2) when he forced her to travel interstate under threat of violence, intentionally preventing her from obtaining medical treatment, thereby causing aggravation of her pre-existing injuries.

### A. "In the Course of": Infliction of Bodily Injury Integrally Related to the Forcible Transportation of a Victim Across State Lines

In order to escape liability under § 2261(a)(2), Page argues that "in the course

... of that conduct" as used in the statute refers to the narrow act of "cross[ing] a State line" rather than to all conduct involved in "caus[ing] a spouse or intimate partner to cross a State line ... by force, coercion, duress, or fraud." As he interprets the statute, it does not reach the violence he committed inside the condominium, even though that conduct was an integral part of his causing his victim to cross state lines by force. This construction not only distorts the plain language of the statute but also makes little sense given the reality of the crime and the very reasons why Congress believed federal involvement was necessary in this area that has traditionally been left to the states.

The crime of violence that took place inside Page's condominium the beating and the use of a stun gun and mace is precisely what enabled Page to force Scrivens to travel across state lines. The beating subdued his victim, rendered her in no condition to resist him physically as she was being placed into his car, and frightened her so severely that she agreed not to make any "commotion" that might attract attention and aid from others once they left his condominium. J.A. at 326 (Scrivens Test. at 428). The attack also allowed Page to retain control over Scrivens during the forcible transportation. Not surprisingly, a person who has just been beaten in the manner Scrivens had been is far less capable physically and emotionally of attempting an escape, formulating a method of escape, or eliciting aid from others. The beating was an integral part of the forcible transportation since it enabled Page to force Scrivens on an unwilling four-hour journey the destination of which was not revealed to Scrivens until much later. J.A. at 332, 337 (Scrivens Test. at 434, 439). Consequently, the beating that took place inside Page's condominium clearly occurred "in the course" of Page forcibly "causing" Scrivens "to cross a State line."

Furthermore, evidence presented to the jury showed that Page removed Scrivens from the local area precisely because he feared the consequences of his having harmed her and knew that interstate travel would make it more difficult for police authorities to hold him liable for his crime.

J.A. at 324–25 (Scrivens Test. at 426–27). It is difficult to believe that Congress intended to exclude from this statute's purview the beating of an intimate partner by a batterer who then forcibly transports his victim across state lines under threat of further violence in order to avoid detection from the law. Gaps and inadequacies of state law enforcement were among the main reasons for which federal legislation dealing with domestic violence was thought to be necessary. The VAWA was intended to deal with the problem of batterers who make their crimes more difficult to discover and prosecute by carrying or forcing their intimate partners across state lines. *See* S.REP. No. 103–138, at 43, 62; *see also Gluzman*, 953 F.Supp. at 87. Those who enacted the VAWA's interstate domestic violence provision recognized that batterers were using interstate travel as a loophole in the system of state law enforcement and that such crimes, "because of their interstate nature, transcend the abilities of State law enforcement agencies." S.REP. No. 103–138, at 62. When batterers take their victims across state lines, local prosecutors often encounter difficulties subpoenaing hospital documents and witnesses from other states. Multi-state jurisdiction is also valuable during the investigative stage, in which local police officers encounter similar barriers. *See* Renee M. Landers, *Prosecutorial Limits on Overlapping Federal and State Jurisdiction*, 543 ANNALS AM. ACAD. POL. & SOC. SCI. 64, 70 (1996) (arguing that federal jurisdiction is appropriate when "offenders seek to exploit the jurisdictional limitations of particular states"); Pamela A. Paziotopoulos, *Violence Against Women Act: Federal Relief for State Prosecutors*, PROSECUTOR, May/June 1996, at 20, 24–25 (recommending ways for state and federal prosecutors to coordinate efforts under VAWA). As it has often done, Congress used the VAWA "to 'com[e] to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent.'" *Moskal v. United States*, 498 U.S. 103, 110, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (quoting *United States v. Sheridan*, 329 U.S. 379,

384, 67 S.Ct. 332, 91 L.Ed. 359 (1946)) (alteration by *Moskal* Court). Page's crabbed interpretation would prevent the statute from reaching precisely the type of situation for which a federal domestic violence statute would be needed and that § 2261(a)(2) was intended to cover.

Reading the statute as Page does, to reach violence that occurs after but not before forced transportation, would be illogical in light of the nature of domestic violence crimes. As events developed, Page's crime of violence was committed as much "in the course" of forcing Scrivens across state lines as that of a person who beats an intimate partner while standing in the driveway with one foot in a car, or a person who beats an intimate partner while parked at various highway rest stops. The sad truth about domestic violence is that the batterers may well be intelligent people who appear to the rest of society to be upstanding, respectable citizens. At minimum, these batterers are sufficiently intelligent to realize that their chances of being held liable for the abuse of an intimate partner are dramatically higher when they beat their intimate partners outside on the driveway in front of the neighbors or at rest stops populated twenty-four hours a day, rather than inside the home behind closed doors and drawn curtains. Congress very appropriately entitled Subtitle B of the VAWA, which contains the interstate domestic violence provision, "Safe *Homes* for Women." *See* Pub.L. No. 103–322, 108 Stat. at 1798 (emphasis added). One reason why our society has taken so long to accept domestic violence as a crime against society is the fact that it typically does not occur in public places among strangers, but in the privacy of one's own home among intimate partners. *See* Kerrie E. Maloney, *Gender–Motivated Violence and the Commerce Clause: The Civil Rights Provision of the Violence Against Women Act after Lo-*

*pez*, 96 Colum.L.Rev. 1876, 1886 & n. 38 (1996). To assume that Congress intended to criminalize only those beatings occurring precisely during travel but not those occurring inside a home that are integrally related to forcible interstate travel would be to suggest that Congress somehow missed the boat.

The text of § 2261(a)(2) refers to violence that occurs in a course of "conduct." Its neighboring statutes demonstrate that Congress knew how to say in the course of "travel" when it wanted to. In addition to interstate domestic violence, Congress has created the federal crimes of interstate stalking and interstate violation of a protection order. *See* 18 U.S.C. §§ 2261A (interstate stalking), 2262 (interstate violation of protection order). All three of these statutes require interstate travel as an element of the crime, but only § 2261(a)(2) and § 2262(a)(2) involve forcing another person to cross state lines. Sections 2261 and 2262 are parallel, prohibiting interstate domestic violence and interstate violation of a protection order, respectively. Subsection (a)(1) of each section prohibits interstate travel with the intent to commit domestic violence or violate a protection order, respectively. In these provisions and in § 2261A, which prohibits travel with the intent to harass coverage is clearly limited to violence or harassment that occurs during or after interstate travel: the statutes refer to actions that occur "subsequent[ ]" to interstate travel or "in the course of or as a result of such travel." *See* 18 U.S.C. §§ 2261(a)(1), 2261A, 2262(a)(1)(B). In contrast, subsection (a)(2) of both § 2261 and § 2262 specifically addresses violations that involve forcing another person to travel, and only these two subsections, of all the VAWA crimes, refer to "that conduct." This is a sensible distinction that should not be read out of the statute.[2]

**2.** Similarly, I would not read into the statute the dissenting judges' requirement that the defendant commit a crime of violence for the purpose of causing the victim to travel interstate. Comparison of subsections (a)(1) and (a)(2) of § 2261 reveals that Congress made a distinction between the two offenses in terms of the defendant's state of mind. Each offense has as an element that the defendant "intentionally" commit a crime of

violence. The first element of § 2261(a)(1) contains the additional requirement that the defendant travel across state lines "with the intent to injury, harass, or intimidate" an intimate partner. In contrast, the first element of § 2261(a)(2) does not refer to the defendant's state of mind but only to whether he "causes" an intimate partner to cross state lines. Section 2261(a)(2) does not require the government to

The drafting history of §§ 2261 and 2262 further indicates that the distinction between "that conduct" and "such travel" is not accidental. When first proposed in 1990, both provisions treated travel by the defendant or the forcing of others to travel in a single subsection. Section 2261 read as follows:

**§ 2261. Traveling to commit spousal abuse**

(a) IN GENERAL.—Any person who travels or causes another (including the intended victim) to travel across State lines or in interstate commerce and who, during the course of any such travel or thereafter, does an act that injures his or her spouse or intimate partner....

S.REP. No. 101–545, at 15 (1990) (proposed VAWA of 1990). Thus, the first draft focused exclusively on travel with the intent to harm. This version clearly would have failed to reach violence that occurred before, but was integrally related to, forcible travel.

The next year, several changes were made to this text. Two of these changes are related to each other and directly relevant to this case.[3] First, the offense created by § 2261 was divided into two offenses, one criminalizing interstate travel for the purpose of committing domestic violence and the other criminalizing forced interstate travel. Second, these two offenses were differentiated by the reference in one to "such travel" and in the other to "that conduct." The new version of the statute was:

**§ 2261. Traveling to commit spousal abuse**

(a) IN GENERAL.—Any person who travels across State lines—

(1) and who, in the course of or as a result of such travel, commits an act that injures his or her spouse or intimate partner; or

(2) for the purpose of harassing, intimidating, or injuring a spouse or intimate partner and who, in furtherance of that purpose, commits an act that injures his or her spouse or intimate partner....

(b) CAUSING THE CROSSING OF STATE LINES.—Any person who causes a spouse or intimate partner to cross state lines by force, coercion, duress or fraud and, in the course or as a result of that conduct, commits an act that injures his or her spouse or intimate partner....

S.REP. No. 102–197, at 17 (1991) (proposed VAWA of 1991). This 1991 language is substantially the same as that which Congress enacted in 1994. A parallel change was made to § 2262. Compare S.REP. No. 101–545, at 16 with S.REP. No. 102–197, at 17–18. It is unlikely that, in separating subsections (a) and (b) of § 2261, the drafters carelessly changed "such travel" to "that conduct" and then repeated the mistake in § 2262. Rather, I believe that they substituted "that conduct" because they intended a meaning different from "such travel."

Two years later, the Senate Report that accompanied the 1993 version of VAWA included one statement that appears to support Page's interpretation of § 2261(a)(2). The report states that the statute "covers cases where the defendant has forced a spouse or intimate partner to cross State lines, and injury or abuse occurs during the course of or as a result of this travel." S. REP. No. 103–138, at 61. This statement was clearly intended as a restatement of the statutory language, but it used the word "travel" instead of "conduct." This unexplained and apparently inadvertent one-word difference between the statutory text and a statement in the legislative history does not trump the plain meaning of the statute.

Page contends that despite the clear meaning of § 2261(a)(2) the rule of lenity requires that the court impose a narrow interpretation. However, the rule of lenity applies only

---

prove that Page attacked Scrivens for the purpose of taking her to Pennsylvania or even that he knew his actions were causing her to cross state lines at the moment it occurred.

**3.** The other major change was that the drafters removed "or in interstate commerce" from the proposed statute, leaving only "travel across state lines." This change made application of the statute more clear-cut and limited it to cases that would actually involve interstate enforcement problems. *See* S.REP. No. 102–197, at 17 (1991) (proposed VAWA of 1991). It does not affect my analysis of the charges against Page, since it is undisputed that he took Scrivens across state lines.

when "a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating polices' of the statute." *Moskal*, 498 U.S. at 108, 111 S.Ct. 461 (quoting *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980)) (emphasis in original). A statute is not deemed ambiguous "merely because it [is] possible to articulate a construction more narrow than that urged by the Government" or because reasonable judges disagree in their interpretations of the statute. *Id.* Here, the statutory language is clear, and the government's interpretation is most consistent with the statutory purpose of remedying gaps and inadequacies in state prosecution of crimes between intimate partners.

The district court's instructions to the jury tracked the language of § 2261(a)(2). J.A. at 431 (Jury Instructions at 716). Page has not pointed out any specific flaw in the instructions, and the statutory language permitted conviction if Page forcibly caused Scrivens to cross state lines and the attack inside the condominium was part of "that conduct." Rather than object to the instructions, Page argued to the jury that the language of the instructions did not reach the attack inside the condominium. Trial Tr. at 639–45, 686–88 (Charge Conference, Closing Arguments). The government, in turn, presented its theory that the attack and the interstate travel were part of a single course of conduct. Trial Tr. at 664–66, 698–700 (Closing Arguments). As I have described, Scrivens was completely incapacitated by the attack, she was under Page's control continuously from just after she entered the condominium until after he left her in the Pennsylvania emergency room, and the attack enabled Page to forcibly remove Scrivens from Ohio against her will. These facts are more than sufficient for a reasonable jury to conclude that the injuries Scrivens suffered during the attack were inflicted in the course of causing her to cross state lines by force, coercion, or duress. It therefore was not error for the district court to allow the jury to consider conviction on that basis. Because there was more than sufficient evidence to support a conviction in this case, this case would not require us to decide the precise outer bounds of the reach of § 2261.

## B. "In the Course of": Aggravation of Injuries During Forced Interstate Travel

While there was sufficient evidence to convict Page on the basis of the attack inside the condominium, the government also presented to the jury its theory that using threats of further violence to force an already severely injured intimate partner across state lines, thereby causing the aggravation of her injuries, is a "crime of violence" causing "bodily injury" to that person in violation of § 2261(a)(2). Trial Tr. at 699–700 (Closing Arguments). The government argues that Page's threats during the trip to Pennsylvania resulted in "bodily injury" to the extent that they kept Scrivens from receiving medical treatment sooner and aggravated her preexisting wounds. I agree that threats can be a "crime of violence," that aggravation of pre-existing injuries can be "bodily injury," and that there was sufficient evidence to convict Page under this theory.

A "crime of violence" includes "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a). It may also be an offense "that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b). To meet this definition, the government was required to prove that Page committed some state or federal "offense" and that this offense was of a type described in § 16(a) or (b). The two offenses that the jury considered were kidnaping and assault. J.A. at 434 (Jury Instructions at 719). The evidence presented was that Page threatened to use a stun gun against Scrivens in order to obtain her cooperation in being transported across state lines. Page kept the stun gun in his pocket and made certain Scrivens knew he had easy access to it during the ride. J.A. at 326 (Scrivens Test. at 428). Moreover, while they traveled interstate, Page threatened to push Scrivens out of the car and to leave her

on the side of the road where no one would ever find her. J.A. at 334 (Scrivens Test. at 436).

At the en banc oral argument, Page claimed that this conduct could not be the underlying "crime of violence" for the interstate domestic violence charge because threats are not "assault" under Ohio law. Ohio defines "assault" as causing or attempting to cause physical harm to another. *See* Ohio Rev.Code Ann. § 2903.13 (Banks–Baldwin West 1994 & Supp.1998); *cf.* Ohio Rev. Code Ann. § 2903.22 (defining menace). The jury was given the Ohio definition of assault and was instructed that "crime of violence" means:

> an offense that has as an element the use, attempted use or threatened use of physical force against the person or property of another or conduct which by its nature presents a serious potential risk of physical injury to another. Crime of violence includes kidnaping and assault.

J.A. at 434 (Jury Instructions at 719). Part of this instruction misstates 18 U.S.C. § 16(b) by failing to specify that only felonies are classified as crimes of violence on the basis of their inherent risk and by requiring that there be a risk of "physical injury" rather than merely a risk "that physical force . . . may be used." However, this error was harmless. Kidnaping and assault were the only possible crimes of violence offered to the jury. J.A. at 434 (Jury Instructions at 719); Trial Tr. at 665, 686 (Closing Arguments). Kidnaping is a felony and satisfies § 16(b); assault satisfies § 16(a).[4]

Page's argument on appeal that his conduct after leaving the condominium was not "assault" overlooks the fact that this conduct caused physical harm to Scrivens. If his threats had merely caused Scrivens to fear him, his crime would have been considered "menacing" rather than "assault" under Ohio law.[5] However, on the particular facts of this case the threats accomplished an assault because they prevented Scrivens from obtaining medical attention and thereby caused her to suffer further injury. I am therefore satisfied that the jury could have found that Page caused physical harm to Scrivens within the meaning of the Ohio statute. *Cf. State v. Brooks,* 44 Ohio St.3d 185, 542 N.E.2d 636, 642–43 (1989) (holding that brandishing a weapon can constitute attempted assault if coupled with other conduct "strongly corroborative" of intent to cause physical harm); *State v. Green,* 58 Ohio St.3d 239, 569 N.E.2d 1038, 1041 (1991) (explaining that the corroborative conduct can include "verbal threats as perceived by a reasonable person under the circumstances"). In fact, this theory of conviction depended on the jury finding that Page's threats caused physical harm to Scrivens, because the government had to prove, as a separate element of the domestic violence conviction, that the threats caused Scrivens to suffer "bodily injury."

Alternatively, the jury could have found kidnaping to be the underlying crime of violence. Although the jury acquitted Page of the kidnaping charge, that acquittal does not require us to assume that the jury did not rely upon kidnaping as the underlying crime of violence for the § 2261(a)(2) conviction. *See United States v. Powell,* 469 U.S. 57, 67–69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (holding that acquittal of a predicate crime does not undermine conviction for a compound crime and stating that "there is no reason to vacate [the] conviction merely because the verdicts cannot rationally be reconciled"); *see also United States v. Gaitan–*

---

4. Although it is possible to read the district court's instructions as permitting the jury to find a "crime of violence" without limiting itself to either kidnaping or assault, the parties' closing arguments, in conjunction with the instructions, made clear that those two crimes were the only choices. Moreover, Page did not object to the district court's definition of "crime of violence" except to argue that on these facts kidnaping could not be a crime of violence. Trial Tr. at 639–45 (Charge Conference), 727 (Jury Instructions).

5. "Menacing" is "knowingly caus[ing] another to believe that the offender will cause physical harm to the person." Ohio Rev.Code § 2903.22. Menacing satisfies the definition of "crime of violence" in 18 U.S.C. § 16(a) and is also considered an offense of violence under Ohio law. See Ohio Rev.Code § 2901.01(A)(9)(a). However, because the jury was not instructed on the elements of menacing, I do not consider it as a predicate crime on which the jury could have based its conviction.

*Acevedo*, 148 F.3d 577, 586 (6th Cir.1998) (affirming conviction for conspiracy despite acquittal on substantive charge), *cert. denied*, —— U.S. ——, 119 S.Ct. 256, 142 L.Ed.2d 210 (1998).[6]

In addition to proving that Page committed a kidnaping or an assault during the actual travel, in order to obtain a conviction under its aggravation-of-injury theory, the government had to prove that the kidnaping or assault caused Scrivens to suffer bodily injury. The statute defines "bodily injury" as "any act, except one done in self-defense, that results in physical injury or sexual abuse." 18 U.S.C. § 2266. The district court went beyond this definition, requiring the government to prove that Scrivens suffered a "significant injury; for instance, an injury that is painful and obvious or is of a type for which medical attention ordinarily would be sought." J.A. at 434 (Jury Instructions at 719). The government presented testimony that Scrivens was "dripping blood onto the emergency room floor" when she arrived at the hospital several hours after the beating and that she lost a significant amount of blood, which caused her to lose consciousness at times during the extended trip. J.A. at 215, 217, 335 (Friend Test. at 159, 161, Scrivens Test. at 437). There was also testimony that Scrivens's wounds were so swollen from the delay in getting to the hospital that emergency room personnel had to call an IV specialist team to get an IV into her. J.A. at 231 (Friend Test. at 175). She experienced great pain throughout the trip. J.A. at 335 (Scrivens Test. at 437). The additional pain caused by the delay and the potentially dangerous loss of blood were certainly "bodily injury."

Nowhere does the statute suggest that the bodily injury must be an injury newly inflicted, completely distinct from the prior criminal actions of the batterer. Such a limitation would make little sense. If we were to require that an injury be "fresh" in order to satisfy the statute, Page's actions would not constitute a crime of interstate domestic violence even if Scrivens had bled to death or gone into shock during and as a result of[7] the forcible transportation. Page's interpretation would also prevent the statute from reaching the conduct at issue in *United States v. Bailey*, 112 F.3d 758 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 240, 139 L.Ed.2d 170 (1997). The defendant in *Bailey* severely injured his wife, put her in a car, and drove around West Virginia and Kentucky for five days before taking her to a hospital. The victim suffered further injuries including blood loss, which led to permanent brain damage, and dehydration, which led to renal failure due to the defendant's failure to obtain medical care or provide adequate food and water.[8] There was no question in *Bailey* that the statute applied. Yet, there is no relevant distinction between a person who forcibly prevents his intimate partner from obtaining medical care, causing her to bleed to death; a person who forcibly prevents his diabetic intimate partner from obtaining insulin shots, causing her to fall into a coma; and a person who forcibly prevents his intimate partner from obtaining food and water for several days, causing her to suffer renal failure. Any prior criminal actions of these batterers should in no way weaken or negate the observation that these three situations are analogous and that in all of these scenarios the batterer has committed a crime of violence causing bodily harm.

---

**6.** This rule also disposes of Page's claim that he cannot be convicted of interstate domestic violence because the kidnaping acquittal necessarily means that Scrivens consented to being taken across state lines.

**7.** The additional injuries Scrivens suffered due to Page's preventing her from obtaining medical care were both "in the course" of the forced interstate travel and the "result" of that forced travel. An event (X) that results from another (Y) does not necessarily need to follow it. The beginning of event X can precede the end of event Y, especially when event Y spans a lengthy period

of time, as interstate travel might. In other words, a crime of violence does not have to take place after the travel completely ends in order for one to say that the crime of violence was the result of the travel.

**8.** The victim in *Bailey* also had bruises on her wrists and ankles, where she had been bound, and these injuries may have been "new," i.e., inflicted after the travel began. *See Bailey*, 112 F.3d at 762. I do not think, however, that the conviction rested on those injuries alone.

I note as well that the seriousness of the bodily injury is not a proper basis for negating criminal liability under § 2261(a)(2). Whether or not one is guilty of interstate domestic violence does not depend on the seriousness of the bodily harm suffered by the victim. The fact that the victim in *Bailey* suffered permanent damage does not render Page any less culpable under § 2261(a)(2). The statute clearly states that the degree of harm inflicted on the victim is instead to be taken into account at the sentencing stage pursuant to 18 U.S.C. § 2261(b).[9] By any definition, the painful swelling and loss of blood that Scrivens suffered as a result of being unable to seek prompt medical attention constituted "bodily injury."

### III. CONSTITUTIONALITY

■ In *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court described three categories of Commerce Clause legislation that Congress may enact. First, Congress may regulate the channels of interstate commerce. Second, it may regulate and protect the instrumentalities of interstate commerce. Third, Congress may regulate intrastate activity if it has a substantial effect on commerce. *See id.* at 558–59, 115 S.Ct. 1624. Because the triggering factor of § 2261(a)(2) is the movement of the victim across state lines, this statute falls into the first category and is a valid exercise of Congress's power to regulate the "use of the channels of interstate commerce."[10] *Id.* at 558, 115 S.Ct. 1624.

The Supreme Court recently reiterated the well-settled principle that "the transportation of persons across state lines" is a "form of 'commerce.'" *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, ——, 117 S.Ct. 1590, 1596, 137 L.Ed.2d 852 (1997) (citing *Edwards v. California*, 314 U.S. 160,

172, 62 S.Ct. 164, 86 L.Ed. 119 (1941), and *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). In *Caminetti*, the Court upheld the White Slave Traffic Act of 1910, under which the defendant had been convicted of transporting a woman across state lines for the purpose of prostitution or debauchery. The Court rejected the argument that the statute exceeded Congress's powers under the Commerce Clause because the purpose of debauchery was unrelated to commerce. *See Caminetti*, 242 U.S. at 484–85, 488 n. 1, 491, 37 S.Ct. 192; *see also Cleveland v. United States*, 329 U.S. 14, 16–19, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (upholding application of the Mann Act to interstate travel for the purpose of polygamous marriage). Section 2261(a)(2) is similarly constitutional under the Commerce Clause because the interstate domestic violence provision's requirement of "the crossing of a state line ... plac[es] the [commission of a crime of violence causing bodily injury] squarely in interstate commerce." *Bailey*, 112 F.3d at 766 (analogizing the commission of a crime of violence causing bodily injury to "the debauchery forbade in *Caminetti*"). Any arguably intrastate nature or timing of the crime of violence is irrelevant, just as it was with respect to the debauchery in *Caminetti*.

Page contends that Congress nonetheless exceeded its constitutional authority because, after *Lopez*, a criminal statute that regulates non-economic activity must be analyzed under the third category. This argument is based on a mis-reading of *Lopez*. *Lopez* has caused some controversy over whether purely intrastate, non-commercial activities can ever have the substantial effect on interstate commerce that is necessary to bring them within Congress's power. *Lopez* did not, however, extend the "substantial effects" test to all Commerce Clause legislation. Congress retains plenary power to regulate

9. Section 2261(b) specifically distinguishes between those situations in which the victim dies, those in which the victim suffers "permanent disfigurement or life threatening bodily injury," those in which the victim sustains "serious bodily injury," and "any other case."

10. My analysis under the first *Lopez* category should in no way be interpreted as foreclosing either the second or third *Lopez* category as a valid basis for upholding the constitutionality of 18 U.S.C. § 2261(a)(2) under the Commerce Clause. I have chosen to limit my discussion to this first category simply because it was the focus of the government's arguments on appeal.

the channels of interstate commerce. *See United States v. Robertson*, 514 U.S. 669, 670, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (explaining that the "substantial effects" test defines the extent of Congress's power to regulate intrastate activity and does not apply when the regulated activity itself crosses state lines); *Gluzman*, 953 F.Supp. at 89–90 (rejecting the same argument that Page makes and upholding § 2261(a)(1)), *aff'd*, 154 F.3d at 50 (adopting "the holding and analysis set forth in the admirable opinion of the district court below"); *see also United States v. Von Foelkel*, 136 F.3d 339, 341 (2d Cir. 1998) (upholding § 2262(a)(1)). To hold that § 2261(a)(2) is unconstitutional, we would have to hold that *Lopez* overruled a long line of cases upholding Congress's power to criminalize acts occurring in interstate commerce. To the contrary, the *Lopez* Court's two examples of Congress's power over the channels of interstate commerce included a criminal prosecution under the Fair Labor Standards Act and a quotation from Caminetti. *See Lopez*, 514 U.S. at 558, 115 S.Ct. 1624 (citing *United States v. Darby*, 312 U.S. 100, 114, 61 S.Ct. 451, 85 L.Ed. 609 (1941) and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (quoting *Caminetti*, 242 U.S. at 491, 37 S.Ct. 192)).

Page tries to distinguish this case from *Caminetti* and other cases allowing congressional regulation of interstate transportation by arguing that the *actus reus* of his crime was the initial attack on Scrivens, which was purely intrastate, while under statutes such as the White Slave Act and the Mann Act the *actus reus* is the actual movement across state lines with immoral intentions. His complaint is that although purporting to criminalize an act of *inter* state travel, Congress has "really" criminalized *intra* state domestic violence. Such an analysis was the basis for the holding that Congress could not

bar the interstate shipment of the products of child labor because it was "really" trying to prohibit child labor itself. *See Hammer v. Dagenhart*, 247 U.S. 251, 271–72, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *overruled by Darby*, 312 U.S. at 116–17, 61 S.Ct. 451. This approach to the interstate commerce power has long since been rejected. Congress undoubtedly has the power to criminalize the forcible transportation of a person across state lines. It may as easily focus its efforts on the smaller class of cases in which the forced transportation is part of an incident of domestic violence in which the victim suffers bodily injury.

## IV. MISCELLANEOUS ISSUES

The panel's decision in this case addressed and rejected several challenges to the district court's evidentiary rulings. *See Page*, 136 F.3d at 487–88. Page has not pressed these objections before the en banc court, and I adhere to the panel's analysis of those issues.

Page also argued to the panel that the district court erred when it determined his base offense level by reference to the Sentencing Guidelines' provision for "aggravated assault," rather than "minor assault." Aggravated assault has a base offense level of fifteen, while minor assault has a base level of six or three. *See* U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) §§ 2A2.2, 2A2.3 (1997). Because the panel reversed Page's conviction, it did not reach this issue.[11]

Page's challenge to his sentence rests primarily on his argument that the attack inside the condominium is not within the scope of his federal prosecution. As I believe that the incidents in the condominium were part of a violation of § 2261(a)(2), I also believe that it clearly was proper for the district court to consider them at sentencing. Even if the jury based its verdict entirely on the "aggravation" theory, it is proper for a sentencing

---

11. The panel noted that, since the time of Page's trial, the Sentencing Guidelines have been amended to specify that the base offense level for domestic violence is fourteen. *See* U.S.S.G. § 2A6.2(a). Two levels are added if one of several factors is present, including infliction of bodily injury or possession or threatened use of a dangerous weapon; four levels are added if more than one of these factors are present. *See*

U.S.S.G. § 2A6.2(b). If the relevant conduct is also covered by other Guidelines, courts are to choose the higher of the two base offense levels. *See* U.S.S.G. § 2A6.2(c). Because I would affirm the manner in which the district court applied the Guidelines in existence at the time of Page's sentencing, I would not impose these harsher provisions.

court to consider all of a defendant's conduct "that occurred during the commission of the offense of conviction [or] in preparation for that offense." U.S.S.G. § 1B1.3(a)(1). This includes conduct that is not charged or for which the defendant is acquitted. *See United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); *United States v. Milton*, 27 F.3d 203, 208–09 (6th Cir.1994), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 741, 130 L.Ed.2d 642 (1995). The district court therefore did not err in basing Page's sentence on the base offense level for aggravated assault.

## V. CONCLUSION

Because 18 U.S.C. § 2261(a)(2) is a valid exercise of Congress's powers under the Commerce Clause and reaches those situations where a beating of an intimate partner is integrally related to the subsequent transportation of the victim across state lines by force, I concur in the order affirming Page's conviction and sentence.

KENNEDY, Circuit Judge, dissenting in the order.

I agree with that part of Judge Moore's opinion that concludes Congress validly enacted the Violence Against Women Act under its commerce power. I cannot agree, however, that the Act criminalizes Page's pre-travel violence in this case and his conviction should be reversed.

Preceded by a descriptive caption, one sentence containing four separate elements defines the federal domestic violence crime in question:

**Causing the crossing of a State line.—** A person who [1] *causes* a spouse or intimate partner *to cross a State line* or to enter or leave Indian country by force, coercion, duress, or fraud [2] *and, in the course or as a result of that conduct,* [3] intentionally commits a crime of violence [4] *and thereby causes bodily injury* to the person's spouse or intimate partner, shall be punished as provided in subsection (b).

18 U.S.C. § 2261(a)(2) (Emphasis and numbering added).

A literal or precise reading of the words of the sentence, and the sequence of elements described there, requires me to find that Page should not be punished under this statute for the criminal assault that occurred before he began to cause Scrivens to cross a state line. That result is necessary because an offender is covered by the statute only if he "causes" the victim "to cross a state line" by force, coercion, duress, or fraud, and "causes bodily injury" to the victim "in the course ... of that conduct;" that conduct of causing the victim "to cross a state line" by force, coercion, duress, or fraud. The literal meaning of the words does not allow punishment of a man who beats a woman before the journey begins *unless of course his purpose in inflicting bodily injury is to cause her to cross states lines.* The provision therefore criminalizes an act of domestic violence that occurs before interstate travel actually begins only if the violence is the same "force" that the attacker employs to cause his victim to cross state lines against her will *and* the attacker's purpose at the time he inflicts the injury is to transport his victim across state lines.

The construction I have described above appears to be the obvious meaning of the statute. In criminal law, we should not strain to give a broad construction to a penal statute. For centuries in Anglo–American law, the rule of lenity has required a strict construction of criminal statutes. *United States v. Lanier*, 520 U.S. 259, ——, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) ("[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"). *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 93–96, 5 L.Ed. 37 (1820) (opinion by Chief Justice Marshall). As Judge Merritt explained in the original panel's opinion in this case, "[w]e must enforce the statute according to the words that Congress actually adopted and not according to our own view of what might be a better or more comprehensive statutory policy on domestic violence against women." *United States v. Page*, 136 F.3d 481, 484 (6th Cir. 1998).

Judge Moore concludes that because Scrivens was completely incapacitated by the

attack, she was under Page's control continuously from the time she entered the condominium until she crossed state lines, and that this somehow permitted the jury to find that the injuries she suffered in the attack in the condominium were inflicted in the course of causing her to cross state lines.[1]  While I agree that injuries inflicted before any travel begins can be found to be a part of "that conduct" if inflicted to cause the victim to cross state lines, there is no evidence here that such intent caused any of the injuries Scrivens sustained before she was placed in the car.

Were the evidence in this case such that the jury could conclude that the *severity* of the attack was to enable Page to take Scrivens across state lines to a distant hospital, then I could agree that conduct was covered by the statute.  But the record does not support a finding that the attack in the condominium had such a purpose.  As Judge Moore acknowledges: "Furthermore, evidence presented to the jury showed that Page removed Scrivens from the local area precisely because he feared the consequences of his having harmed her and knew that interstate travel would make it more difficult for police authorities to hold him liable for his crime."

If there were some evidence that any of the particular *injuries* inflicted on Scrivens were inflicted not merely to prevent her escape from the condominium, but specifically in order to make it easier to transport her across state lines, a juror could find that defendant's effort to cause her to cross state

lines had begun.  I could then agree that Page's attack is covered by the statute.  While causing someone to cross state lines encompasses broader conduct than simply traveling across state lines, still there must be some evidence from which the jury could find the connection between the earlier violence and "causing" the victim to travel.  More important, even were we to accept Judge Moore's reading of the statute, the jury was never instructed that the injuries had to be inflicted as a part of causing her travel.  The government's closing argument that it was all the "same course of conduct" is not a substitute for a proper instruction.

In sum, the plain language of section 2261(a)(2) shows that Congress did not intend the statute to apply to those attacks where, after the fact, the defendant decides to use interstate travel to conceal his wrongdoing.  By no means do I suggest that Congress should not have criminalized such conduct.  Indeed, the particularly disturbing facts of cases such as *Page* and *United States v. Bailey* suggest that it would not have been illogical to criminalize flight across state lines to avoid apprehension.[2]  As enacted by Congress, however, the Act requires the attacker to intend to cause interstate travel.  The provision at issue applies to situations where "force, coercion, duress or fraud" on the part of the defendant triggers the interstate travel, and then sometime in the course or as a result of *causing* the victim to travel, the defendant commits a crime of violence and inflicts bodily injury on the victim.  Sad-

1. Judge Moore appears to be including in "that conduct" any continuous control that is followed by the crossing of a state line without regard to the defendant's intent.

2. Only two other prosecutions arising under § 2261(a)(2) have reached the courts of appeal to date: *United States v. Bailey*, 112 F.3d 758 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 240, 139 L.Ed.2d 170 (1997), and *United States v. Hornsby*, 88 F.3d 336 (5th Cir.1996).  In both *Bailey* and *Hornsby*, as in this case, the defendant brutally beat his victim first (without any obvious present intent to transport her across state lines) and then after she was subdued, put her in a car and transported her across state lines.  Neither defendant specifically challenged the application of § 2261(a)(2) to pre-travel violence.

   The defendant's evasive behavior in *Bailey* was particularly egregious.  The defendant attacked his wife in their bedroom, inflicting head injuries and causing her to lose a significant amount of blood.  After letting her lie there for "an extended period," he locked her in the trunk of the car and drove her back and forth between West Virginia and Kentucky over the next six days.  He decided "not to take her to a hospital, but rather to 'avoid publicity and to treat her himself.'"  *Bailey*, 112 F.3d at 762.  Her condition became "desperate" and Bailey realized he needed to take her to the hospital.  By the time she arrived, many of Mrs. Bailey's injuries were permanent.  The doctor testified that she will likely never walk again, but with years of rehabilitation she might learn to feed herself and to talk.  *Id.* at 763–64.

ly, Congress simply did not draft the statute to cover the situation in which an attacker first beats an intimate partner, and only later develops the intent to transport her across state lines in order to hamstring law enforcement efforts or conceal evidence. If Congress intends to criminalize such conduct, Congress should state so clearly. Accordingly, I would reverse the judgment and the conviction.

I agree with Judge Moore that the evidence would permit the jury to find that the further injuries Scrivens suffered while the defendant was causing her to cross state lines would sustain a guilty verdict. However, the case was neither argued to the jury nor submitted on instructions on that theory.[3] I would, therefore remand the case for a new trial on that theory.

RYAN, Circuit Judge, dissenting.

The charge against the defendant, as laid in the indictment, required the government to prove that the defendant violated 18 U.S.C. § 2261(a)(2) by inflicting physical violence upon Scrivens "in the course or as a result of" causing her, by force, coercion, or duress, to cross the state line. The evidence does not show that; rather, it shows that the defendant inflicted physical violence upon Scrivens at her condominium, before he forced her to cross the state line.

Judge Moore's opinion attempts to give section 2261(a)(2) a meaning its language cannot accommodate, apparently on the theo-

ry that Congress surely must have intended to punish what the defendant did. But the square-pegged evidence in the record cannot properly be hammered into the oblong-shaped statute—not if faithfulness to the words of the statute matters—because it does not fit. Equally unavailing is Judge Moore's apparent willingness to affirm the defendant's conviction on the basis of the post-interstate-travel injuries Scrivens suffered, because that theory of culpability was not argued to the jury or submitted to it by the trial court in its instructions.

Domestic violence against women is deplorable—often cowardly—but it ill suits this court to rewrite more broadly what Congress has written narrowly on the theory that had it anticipated what the defendant did here, Congress surely would have wanted it punished.

I do agree with Judge Moore on one point: the Violence Against Women Act is plainly constitutional.

WELLFORD, Circuit Judge, dissenting.

This is a difficult case of first impression for our court. Essentially, Judge Moore applies the Violence Against Women Act to cover the situation where defendant assaulted and impaired seriously a female partner before any interstate transportation occurred. I cannot agree that vague threats, unaccompanied by any physical violence during the course of the interstate travel, is

**3.** The following are the totality of the court's instruction on the elements of the domestic violence charge.

One, that Carla Elena Scrivens was the spouse or intimate partner of the defendant Derek Duane Page;
Two, the defendant Derek Duane Page caused Carla Elena Scrivens to cross a state line by force, coercion, duress or fraud;
Three, that in the course of or as a result of that conduct the defendant Derek Duane Page intentionally committed a crime of violence;
And, fourth, thereby caused Carla Elena Scrivens to suffer bodily injury.

\*     \*     \*

Similarly, count two of the indictment reads in the disjunctive in that it charges that the defendant Derek Duane Page did cause his intimate partner Carla Elena Scrivens to cross a state line from Ohio to West Virginia and

from West Virginia to Pennsylvania and elsewhere by force, coercion, duress or fraud.

It is not necessary to prove beyond a reasonable doubt that defendant Derek Duane Page used all of these methods to cause Carla Elena Scrivens to cross a state line. Rather, you need only find beyond a reasonable doubt that defendant Derek Duane Page intentionally used one of these methods; for example, by force, coercion, duress or fraud.

At no place in the instructions did the court explain the meaning of "that conduct."

The government argued only as follows:

The language "in the course of this conduct" or "in relation to the conduct" doesn't matter if the beating occurred first or the beating occurred last or if he pushed her out on the way. The fact is it was in the same course of conduct. It happened the same night by the same person with the same victim, and that's the meaning of the statute.

sufficient for conviction under the charge if the threats and travel "kept Scrivens from receiving medical aid sooner." Defendant did, after he committed his reprehensible attack in Ohio, transport Scrivens across a state line and finally delivered her to a hospital for treatment. He displayed no weapon and laid no hand upon her during the trip. Furthermore, I do not agree that aggravation by failure to treat can constitute "bodily injury" within the meaning of the statute.

Nor can I agree that one acquitted of kidnapping may yet be deemed guilty of that offense under Ohio law dealing with the meaning of assault, or under § 2261(a)(2). Whatever else the meaning and effect of Page's kidnapping acquittal, it does not permit the court to treat kidnapping as being an "underlying crime of violence for the § 2261(a)(2) conviction." I do not believe *United States v. Powell,* 469 U.S. 57, 67–69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), which stands for the proposition that we do not vacate convictions merely because verdicts cannot be reasonably reconciled, supports the Judge Moore's rationale in this case.

To the contrary, I believe that the language in S.Rep. No. 103–138 at 61 that the statute in question "covers cases where the defendant has forced a spouse or intimate partner to cross State lines, and injury or abuse occurs during the course of or as a result of this travel" is the proper interpretation of this ambiguous statute. Section 2261(2) refers to "causing the crossing of a state line," or travelling in interstate commerce; it is not clear to me that the "in the course of or as a result of such conduct" language refers to such travel or to violent conduct or force causing such travel, or whether force, coercion and assault that occurred *before* the interstate travel is covered at all.

This case was neither argued by the government nor submitted to the jury on instructions that the jury might determine that further bodily injuries, if any, suffered by Scrivens while in the course of interstate travel after the initial Ohio assault, were sufficient to support guilt.

There was no proof in this case that any physical assault or force was applied to Scrivens' body after she and Page left the Ohio apartment together. The record reveals the following testimony of Scrivens:

Am I correct that, from the minute you left the apartment until the time that Derek left you at the hospital in Washington, Pennsylvania, that he did not strike you, hit, you, do anything of that nature?

A. Right.

Q. So the injuries that you presented with at the hospital in Washington, Pennsylvania were injuries that you suffered inside that apartment; isn't that true?

A. That's true.

Q. Once you got to the hospital, am I correct that you're in a wheelchair, and somebody some man, white man, showed you down to the emergency room from where you were, where you first came in the hospital?

A. Derek pushed me. He was directing us to the emergency room, and he was pushing me in the wheelchair.

In short, I cannot agree that the initial beating in Ohio may constitute interstate domestic violence, because such violent conduct enabled Page to force Scrivens, at a much later time, to cross state lines without using any further physical force to inflict further bodily injury. I do not believe that by enacting the language in question, Congress intended to criminalize some indirect connection between interstate travel and violent acts occurring before such travel bringing about domestic bodily injury. This is not construing the statute to require an act of violence "occurring at the moment a state line is crossed." Judge Moore cites S.Rep. No. 103–138 at 61 (1993) as indicating an intent to provide a federal remedy for "interstate crimes of abuse including crimes committed against spouses or intimate partners *during interstate travel.*" My point in this case is that the violent acts and beating of the intimate partner did not occur "during interstate travel." The jury instructions did not make it clear exactly what had to be proven, particularly where the jury did not

conclude that kidnapping had occurred, involving a forceful taking across state lines.[1]

In addition, I share some skepticism about this statute which purportedly is based upon concern about gender violence. What if the victim in this case were Page's former wife with whom he had no relationship at the time of the offense? What if it had been another female relative, neither his wife nor intimate partner? Prosecution of such an offense against any female by Page would have been handled by the states as it has been handled in cases of assault and battery, long before this statute came into being. *See Brzonkala v. Virginia Polytechnic Institute,* 132 F.3d 949, 967 (4th Cir.1997) (concluding that the statute passes constitutional muster because "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce").

I also note that the language used is not that crimes of violence, motivated by domestic abuse and discord, have a substantial effect on interstate commerce. I would call attention, in this regard, to the *Brzonkala* dissent's statement:

Ignoring entirely the overarching change in Commerce Clause analysis wrought by *Lopez* [514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)], the majority merely recites several statements from House and Senate committees on the general problem of violence against women and the effect of that violence on the national economy. . . .

. . .

The majority's wholesale deference to a committee finding would at least be understandable if that committee had made extensive findings deserving of deference. However, the majority ultimately sustains the constitutionality of the Act literally on the basis of a single sentence appearing in that committee report, which sentence is, itself, entirely conclusory.

. . .

In short, the majority opinion reads, as intended, as if *Lopez* were never decided,

holding for our Circuit, explicitly on the authority of Judge Kravitch's opinion in *United States v. Wright,* 117 F.3d 1265, 1269 (11th Cir.1997), and implicitly on the reasoning advocated by the dissenting Justices in *Lopez,* that " '*Lopez* did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority.' " 132 F.3d at 974, 975, 977 (Luttig, C.J., dissenting).

Accordingly, I would **REVERSE** the conviction in this case, realizing that Page may still be prosecuted, and/or sued civilly, for his actions in Ohio state court.

---

1. *United States v. Bailey,* 112 F.3d 758 (4th Cir. 1997), distinguished VAWA and kidnapping because the former required "a spouse or intimate partner" as victim. *Id.* at 767. Surely kidnapping in this case cannot be the "underlying crime of violence" in view of the jury's acquittal on that charge, yet the majority says "the jury could have found kidnapping to be the underlying crime of violence." Can the jury both acquit and convict based on the same charge? I think not.