**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MATTHEW EVANS DOWD,
*Defendant-Appellant.*

No. 04-30062

D.C. No.
CR-03-00007-DWM

OPINION AND
ORDER

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Submitted January 11, 2005*
Seattle, Washington

Filed August 8, 2005

Before: Mary M. Schroeder, Chief Judge, Susan P. Graber
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

---

*This panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Darla J. Mondou, Upton, Massachusetts, for the defendant-appellant.

Joshua S. Van de Wetering, Assistant United States Attorney, Missoula, Montana, for the plaintiff-appellee.

## OPINION

FISHER, Circuit Judge:

A jury convicted Matthew Evans Dowd of violating the federal interstate domestic violence law. He argues that the jury did not have sufficient evidence that he forced or coerced his companion, Danna Johnson, to cross state lines, as the statute requires, because she had reasonable opportunities to escape.

Dowd also challenges the district court's decision to impose a sentence for the domestic violence crime that is consecutive to his sentence for previous drug-related crimes. He further argues that the district court improperly enhanced his sentence as a sexual crime in violation of *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

We affirm Dowd's conviction. The evidence demonstrated that Dowd subjected Johnson to numerous instances of physical and psychological abuse as they traveled through Mon-

tana, Colorado and Utah. Viewed from the perspective of a reasonable woman in Johnson's circumstances, the jury could readily have found that Dowd, through a combination of actual force and dire threats, compelled Johnson to stay with him and made her fearful of attempting to flee.

We further affirm Dowd's sentence because the district court properly exercised its discretionary authority in imposing a consecutive sentence, and the jury found that Dowd had committed a sexual assault, making him eligible for the statutory enhancement.

## I.

The events giving rise to Dowd's conviction occurred over an 8-month period between May and December 2002. Dowd and Johnson had met before in 1999, in Missoula, Montana, where Johnson had worked as a respiratory therapist. In August 2001, after becoming romantically involved, Dowd and Johnson moved in together, and Johnson, under Dowd's influence, began using methamphetamines. Dowd left her a few months later and shortly thereafter was indicted for distribution and possession of methamphetamine, possession of a firearm in relation to a drug-trafficking crime and being a drug user in possession of a firearm. Dowd was arrested and later pled guilty to two of the counts. He petitioned the court to attend a drug rehabilitation facility in Butte, Montana, before his sentencing. In May 2002, he was discharged and was supposed to surrender to the Missoula Detention Center within three hours of his release. Instead, he fled.

In the meantime, Johnson had lost her job, quit using drugs and moved to Colorado. After her move to Colorado, Johnson contacted Dowd's mother because Johnson knew Dowd had been in trouble. Dowd's mother told Johnson that he was on probation for six years, working in California and was clean and sober. Dowd's mother urged Johnson to speak with Dowd by phone. They did so, and when Dowd fled the rehabilitation

facility in Missoula in May 2002, he headed to Colorado, where he knew Johnson was then living.

The two moved in together, but within a week Johnson realized Dowd was buying drugs. She confronted him one night about the drug purchases, prompting an altercation at a local bar. She walked out of the bar to go home, but Dowd followed her, swung at her and unsuccessfully tried to force her into the car. Johnson did not return home until many hours after the incident, thinking it was safe to go back into their apartment because Dowd did not have a key. Dowd, however, had broken in and was waiting inside when she entered the apartment. He punched, raped and tried to suffocate her. Dowd then told Johnson that they needed to leave the apartment because the neighbors could hear everything, and he no longer felt safe there. After Dowd said that he planned to leave and take her with him, Johnson tried to run out of the apartment to a local convenience store but Dowd overpowered her. Johnson testified that "he said he couldn't let me go because he was an escaped felon and I would just rat on him." Until that point, she had not known Dowd was an escaped felon.

Dowd pulled Johnson by the hair and pushed her down the street, shoving the back of her head until she got into the car's driver's seat. They stopped at a phone booth where Dowd called his mother. However, Dowd had tied a shoelace to the car key so that when they stopped, he could pull the key out of the ignition and take it with him. Without the car key, Johnson could not drive away and did not believe she could run fast enough to escape on foot.

That night, the pair stayed in a motel because Dowd did not feel it was safe to return to their apartment, and he was awaiting money from his mother. Dowd kept close tabs on Johnson at the motel, for example hovering over her as she checked into their room. Johnson said she did not try to seek help or

escape at that time because she worried that there would be repercussions for her family.

The next day, they returned to the apartment to pack up their clothes, dishes and other personal items. The apartment manager testified that he saw Johnson unloading boxes from the trunk of her car and that she appeared upset. The manager also said that while Johnson was at the apartment, Dowd was at the manager's house, some two-and-a-half miles away, doing landscaping work.[1]

After collecting their belongings, Dowd made Johnson drive straight from Colorado to Dowd's mother's home in Montana. Johnson did not scream out for help along the way because she was too afraid for the lives of her grandchildren and sister, whom Dowd had threatened to kill. On their drive, Dowd taunted Johnson by asking her: "How did it almost feel to die today?" Dowd removed the car key at every gas station or phone break. Johnson said she unsuccessfully tried to ruin the transmission of the car — hoping that would stop the progress of their trip — by throwing the car into reverse while driving at 75 miles an hour. When her plan failed, and seeing no other options for getting away from Dowd, Johnson decided during the road trip, "I'll do what he says and when we get to his mother's house, his mother will help me." But when they arrived in Montana, Dowd's mother told Johnson not to antagonize her son because that would only result in more beatings. Dowd continued to physically and sexually abuse Johnson at his mother's house, where they stayed intermittently over the following weeks. Johnson said Dowd would wrench her neck and beat her so that she was covered with bruises. "[H]e would laugh and make fun of me, that I was walking like an old woman. And it was because I hurt so bad."

---

[1]Johnson was not questioned as to why she did not attempt to flee from Dowd on this occasion.

About a week and a half after arriving in Montana, Johnson drove Dowd to Utah for three to four days, so that he could purchase drugs. On a second trip to Utah, Dowd sold items at pawn shops so he could purchase drugs. On one occasion, Johnson went into a pawn shop when Dowd was not around. But Johnson said she was too afraid for her family's well-being to run away. When in Utah, Johnson and Dowd stayed with Dowd's brother at a motel. The motel manager testified that at times Johnson would walk around the motel alone, for example going to the candy machine by herself. The manager noted that Johnson appeared to have bruises around her eyes. Johnson testified that during the trips between Montana and Utah, Dowd was beating her almost every day, and she was weak from not having eaten. Dowd also brought a gun with him on the trips to Utah, intending to pawn it while there, and would threaten Johnson with the gun in the car. The second trip to Utah lasted about a week before the pair returned to Montana.

On New Year's Eve 2002, the two went to a bar in Montana, where Dowd got drunk. Dowd insisted they leave and drove the car back to his mother's house. When they arrived, Johnson pulled the car key out of the ignition and jumped out of the car. Johnson then attempted to get into the driver's seat, but Dowd grabbed her and threw her down an embankment. He left her for dead and went into his mother's house. Johnson was able to get into the car and drive to a friend's house.

Johnson hid out with different individuals for almost a month because she heard that Dowd "was hunting me down." She eventually called the agents who had been searching for Dowd since he became a fugitive. A medical expert diagnosed Johnson with post-traumatic stress disorder. During the medical interview, Johnson spoke of being repeatedly choked and showed some signs of injury to her neck. She also had restricted movement in her jaw.

Dowd was convicted under the federal interstate domestic violence statute. 18 U.S.C. § 2261(a)(2). The district court

sentenced Dowd to 127 months for the violation of the statute and willful failure to appear for his prior offense. The court imposed the sentence to run consecutive to the 144-month undischarged sentence from Dowd's previous guilty plea for the drug-related crimes.

## II.

Dowd did not move for acquittal under Fed. R. Crim. P. 29. Thus, his claim that his conviction is not supported by the evidence is reviewed for plain error. *United States v. Weber*, 320 F.3d 1047, 1050-51 (9th Cir. 2003). A conviction is supported by sufficient evidence if, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 1050.

A district court's interpretation and application of the sentencing guidelines are reviewed de novo. *United States v. Arellano-Torres*, 303 F.3d 1173, 1176 (9th Cir. 2002). Dowd's claim that his sentence violates *Apprendi* also is reviewed de novo. *United States v. Garcia-Guizar*, 234 F.3d 483, 488 (9th Cir. 2000).

## III.

[1] The federal interstate domestic violence statute requires that the defendant cause "a spouse or intimate partner to travel in interstate or foreign commerce . . . by force, coercion, duress, or fraud." 18 U.S.C. § 2261(a)(2). As the Fourth Circuit has explained, the "words 'force, coercion, or duress' necessarily require that the victim is a non-consenting participant in the interstate travel." *United States v. Helem*, 186 F.3d 449, 456 (4th Cir. 1999). Dowd argues that despite all the evidence of his physical and psychological abuse of Johnson, the government failed to prove that Johnson traveled with him across state lines involuntarily. In particular, he cites various opportunities she had to escape; that she stayed even when he

was not around, he contends, negates any finding of force or coercion. We conclude to the contrary — the evidence supports a finding that Dowd, using both force and coercion (or duress), caused Johnson to accompany him on their interstate travels.

**[2]** First, there was sufficient evidence that Dowd *forced* Johnson to cross state lines. The jury heard detailed testimony from Johnson that Dowd beat and raped her in Colorado just before his decision to leave for Montana. When she tried to run for the convenience store, Dowd overpowered her, dragged her by her hair to the car and made her start driving. The pair stayed that night at a motel, where Dowd kept close watch on Johnson. The next day they returned to the apartment to pick up their belongings. Dowd ordered Johnson to make sure every item of his was out of the apartment, particularly his identification. Once they began driving, Dowd "kept complete control of the car" by holding onto the key and threatening to kill Johnson and her family if she did not obey him.

**[3]** These acts of physical violence and dominance before and during the drive from Colorado to Montana could permit a reasonable juror to find that Dowd caused Johnson to drive across state lines by force. *See United States v. Baggett*, 251 F.3d 1087, 1096 (6th Cir. 2001) (holding that jury could find the defendant forced his wife to cross state lines given his admission that he had beaten his wife in both states); *Helem*, 186 F.3d at 455 (holding that defendant's assault of his victim in one state, making her afraid of being beaten again and unable to resist the defendant physically, was sufficient to establish that defendant forcibly caused her to cross state lines); *see also United States v. Bowe*, 309 F.3d 234, 236 (4th Cir. 2002) (noting that defendant who pled guilty under § 2261(a)(2) had forced his estranged wife into an SUV through physical threats and intimidation, slapping and stabbing her during their trip across state lines).

Johnson also described repeated acts of violence Dowd committed against her while at his mother's home in Montana, including in between the two trips to Utah. Although some time elapsed between the beatings and rapes and the Utah trips, the jury could have reasonably concluded that the pattern of Dowd's abuse caused Johnson to join him on these trips. That Dowd chose to threaten her with a gun reinforces that Johnson was not a volunteer.

[4] Second, the evidence supported a finding by the jury that Dowd caused Johnson to cross state lines by *coercion* or *duress*. As to this element of the offense, the district court (without objection) instructed the jury as follows:

> The terms coercion and duress are interchangeable. Coercion or duress exists when an individual is subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there is no reasonable opportunity to escape.

Dowd contends that because Johnson was sometimes free from his supervision during their interstate trips and able to talk with others who could have provided help, she had a reasonable opportunity to escape, thus precluding any claim that he coerced her to cross state lines.

[5] The district court's jury instruction, modeled after the interpretation of § 2261(a)(2) by the Fourth and Sixth Circuits, properly defined the elements of coercion or duress, which we shall refer to simply as "coercion." *See Helem*, 186 F.3d at 456-57; *Baggett*, 251 F.3d at 1096. Applying that definition here, we hold that the jury had overwhelming evidence from which to find that Dowd coerced Johnson to travel between the three states. The jury also could have concluded that Dowd's systematic physical and psychological coercion prevented Johnson from escaping earlier than she did. For example, Johnson testified that she dared not leave Dowd

because she was "too afraid for my daughter and my grandchildren and my sister's life." She said that Dowd was always telling her exactly what to do, and she knew "if I didn't do it, exactly what was going to happen." Dowd closely scripted her phone conversations with her sister, so that Johnson could do little more than ask her sister for money. Johnson added that she was concerned that she would be charged with harboring a fugitive, a fear Dowd deliberately planted in her mind. She further said that at times during their journey, she was weak from not eating and being beaten, and she did not think she could outrun Dowd even if she tried. Dowd also carried his gun on their trips to Utah, using it to threaten Johnson. Finally, Johnson discovered that neither Dowd's mother nor his brother would help her escape.

Dowd argues that Johnson had reasonable opportunities to escape when she was outside his supervision, such as when she went to retrieve their belongings from the apartment and Dowd was miles away at the apartment manager's house; during their drive from Colorado to Montana when Dowd stopped to make phone calls, when Johnson was alone in Dowd's mother's home or when she went to a pawn shop by herself in Utah.

**[6]** But coercion does not mean the defendant has to maintain constant physical control or oversight of his victim. Indeed, the statute is written in the disjunctive — "force, coercion, duress, *or* fraud" — denoting that coercion is different from the actual use of force, and indicating that a victim's will to escape can be undermined by a variety of means not involving immediate physical force, including threats of reprisal or psychological conditioning. As the Sixth Circuit has observed, "a person who has just been beaten in the manner [the victim] had been is far less capable physically and emotionally of attempting an escape, formulating a method of escape, or eliciting aid from others." *United States v. Page*, 167 F.3d 325, 328 (6th Cir. 1999)(en banc)(per curium) (Moore, J., concurring)(holding that defendant forcibly

caused his victim to cross state lines by beating her so as to subdue her before the journey); *see also Baggett*, 251 F.3d at 1096-97 (holding that the victim did not have a reasonable opportunity to escape simply because she begged to stay with defendant rather than be thrown out of his moving truck); *cf. United States v. Sickinger*, 179 F.3d 1091, 1093 (8th Cir. 1999) (concluding that even though defendant's control over his victim had "slackened," his victim had not been "released," because she had been beaten severely, lost blood and been warned not to flee); *see also* Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L. Rev. 1191, 1208 (1993) ("To negate the impact of the time period between discrete episodes of serious violence — a time period during which the woman may never know when the next incident will occur, and may continue to live with ongoing psychological abuse — is to fail to recognize what some battered women experience as a continuing 'state of siege.' ").

**[7]** We also draw support for our interpretation from the legislative history of the Violence Against Women Act, which contains the interstate domestic violence statute. Congress addressed the importance of recognizing the particular circumstances faced by victims of domestic violence. In enacting one measure that provided for training judges on dealing with issues of rape and domestic violence, Congress emphasized that "[t]oo often, the focus is on the woman's behavior — 'Why does she stay?' — instead of an examination of why men batter and why our culture and the justice system often allow men to continue this illegal behavior." S. Rep. No. 103-138, at 46 (1993). Congress warned that such presumptions may result from a "lack [of] information about the psychological, economic, and social realities of domestic violence victims." *Id.* In light of Congress' stated concerns, we believe a defendant should not avoid liability based on speculative conclusions that the victim could have escaped a violent defendant simply because he was not close at hand.

Instead, when a jury is assessing a victim's opportunity to escape, it is the victim's perspective that counts. The jury must take into account whether a reasonable person in the victim's position would believe she (or he) could effectively escape. Although we have not found cases specifically addressing the concept of escape in the context of the interstate domestic violence statute, the government analogizes to the duress defense in criminal cases. Whether an individual charged with a crime acted under duress and therefore has a valid defense depends on whether, under all of the circumstances, the defendant had a reasonable opportunity to escape rather than commit the crime. *See United States v. Verduzco*, 373 F.3d 1022, 1030-31 (9th Cir.) (upholding jury instruction that duress defense requires considering "whether one in the defendant's position might believe that reporting the matter to the police did not represent a reasonable opportunity of escape"), *cert. denied*, 125 S. Ct. 508 (2004); *United States v. Contento-Pachon*, 723 F.2d 691, 694 (9th Cir. 1984)(noting that the trier of fact must decide whether one in defendant's position would believe reporting to the police, whom the defendant thought to be corrupt, or fleeing with his family represented reasonable opportunities for escape).

We also consider instructive our Title VII case law, holding that the " 'objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.' " *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (other internal quotation marks omitted)). In *Ellison v. Brady*, we endorsed the view that harassment should be analyzed from the perspective of the victim, taking into account the gender of the plaintiff alleging a hostile work environment. 924 F.2d 872, 879 (9th Cir. 1991) (adopting a "reasonable woman" standard for cases brought by female plaintiffs).

**[8]** We hold that for purposes of § 2261(a)(2), whether the victim was subject to coercion or duress or had a reasonable

opportunity to escape must be evaluated from the perspective of a reasonable person in the victim's position, considering all of the circumstances, including the victim's gender. Applying this standard, we conclude that the jury could have found Johnson to have been completely intimidated by Dowd's sustained actual and threatened physical, sexual and psychological abuse; his unremitting subjugation of her; his threats of retribution against her family; and her fear of being implicated in harboring a fugitive. Johnson was repeatedly beaten, raped and humiliated; she was at times weak from hunger and her injuries; she did not think she could outrun Dowd in her condition. In short, the jury easily could have determined that a woman in Johnson's position, subject to months of physical and psychological abuse at Dowd's hands, had no reasonable opportunity to escape her oppressor.

## IV.

**[9]** Dowd raises two issues with regard to his sentencing. First, he challenges the district court's decision to impose a consecutive sentence for the domestic violence conviction to run after the completion of Dowd's undischarged sentence for his drug-related guilty plea. The U.S. Sentencing Guidelines govern the determination of whether to apply a concurrent or consecutive sentence. The relevant provision in this case allowed the district court to impose a concurrent, partially concurrent or consecutive sentence "to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c). The guidelines direct the court to evaluate a number of factors in making its determination, including factors that are generally considered in imposing a sentence, *see* 18 U.S.C. § 3553(a), as well as factors more specific to the choice between concurrent and consecutive sentences, *see* U.S.S.G. § 5G1.3(c), cmt n.3.

The district court imposed a 127-month sentence to run after the 12 years Dowd had yet to serve for his prior drug-crime conviction. The court noted that "[i]n considering a rea-

sonable incremental punishment for the instant offense and to avoid unwarranted disparity," it was required to consider the factors outlined in the sentencing guidelines. Evaluating the factors, the court concluded that Dowd was not a "person that's capable of being rehabilitated." The court further stated that to impose a concurrent sentence "would not accomplish the goals of sentencing, which would primarily be punishment, the protection of the public and to prevent recidivism." The district court rejected any mitigating factors that weighed in favor of a concurrent sentence.

**[10]** We conclude that the district court properly considered and evaluated the factors in the sentencing guidelines in deciding to impose a consecutive rather than a concurrent sentence. Had the district court imposed a consecutive sentence under one of the guideline provisions *mandating* that it do so, we would face the question whether to remand for resentencing in light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which rendered the sentencing guidelines discretionary, and this court's decision in *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). Because the provision applied by the district court already gave it full discretion to impose a concurrent, partially concurrent or consecutive sentence, however, a remand is not warranted here. *Booker* did not change the application of this provision of the guidelines.

We note further that any *Booker* error in the district court's consecutive sentencing would be harmless. The district court made clear that a consecutive sentence was appropriate in this case, notwithstanding the court's own concerns generally about the harshness of punishment under the guidelines. "I am convinced that the guidelines and a consecutive sentence are, indeed, warranted by the facts and by Mr. Dowd's past behavior and his involvement in the criminal culture. I don't think that the sentence run consecutive here is too harsh. If anything, it may be too short." We therefore affirm the court's decision to impose a consecutive sentence.

Second, Dowd contends that the district court erred in enhancing his sentence for committing sexual assault because the jury did not find beyond a reasonable doubt that he sexually assaulted Johnson. *See Apprendi,* 530 U.S. at 476-77. Thus, Dowd argues, his Sixth Amendment right to a jury trial was violated. We reject this constitutional claim.

**[11]** The sentencing guidelines relevant to the domestic violence statute provide that if another criminal offense is committed in the course of violating the statute — such as sexual assault — the sentence level from that other offense may be applied if it is greater than the sentence level for the domestic violence charge. U.S.S.G. § 2A6.2. In this case, the other offense was sexual abuse, which carries a sentence that is 9 levels higher than the base penalty for the domestic violence statute. The court applied the offense level associated with sexual abuse rather than the offense level for domestic violence, thereby increasing his sentencing range from 41 to 51 months to 100 to 125 months. The court further enhanced Dowd's sentence by 4 levels for committing the offense by force or threat and by 2 levels because the victim sustained injury.[2]

**[12]** The interstate domestic violence statute does not list as an element of the offense the commission of a sexual assault, but requires only that the defendant commit a "crime of violence." Dowd was not charged separately with the crime of sexual abuse. However, the indictment against Dowd specified that the "crime of violence" at issue here was "assault and sexual assault." In Count III, the indictment charged that Dowd "knowingly cause[d] an intimate partner, Danna Johnson, by force, coercion or duress, to travel in interstate commerce and, in the course of or as a result of such conduct, committed and attempted to commit a crime of violence against her, that is, *assault and sexual assault*, in violation of

---

[2]Dowd does not object to either of these two enhancements, conceding that the jury found he used force and caused bodily injury.

Title 18 U.S.C. § 2261(a)(2)." The district court read the indictment to the jury as part of the jury instructions. Even though the following instruction, listing the elements of the offense, stated simply that the jury had to find that Dowd "committed a crime of violence upon Danna Johnson," the only crimes of violence charged by the grand jury, and the only crimes of violence testified to, were "assault and sexual assault." The jury found Dowd not guilty of Count I, which charged Dowd with abducting Danna Johnson "for the purpose of assaulting her"; Count I did not charge that his purpose was "sexual assault." Similarly, the jury found Dowd not guilty of Count V, which charged that Dowd knowingly traveled in interstate commerce with the intent to injure Danna Johnson and that he placed her in reasonable fear of death or serious bodily injury by threatening her with physical violence. Given these circumstances, when finding Dowd guilty of "Count III of the indictment" the jury logically must have found, beyond a reasonable doubt, that he had committed sexual assault.

**[13]** At sentencing, Dowd's lawyer objected to the enhancement, arguing that "there was no proof beyond a reasonable doubt of any criminal sexual abuse." The court disagreed (apparently with the proposition that the evidence was insufficient, as well as with the proposition that the jury had not found Dowd guilty) and presumed that the jury had found Dowd guilty of the crime of sexual abuse, as charged in the indictment. As an alternative ruling, the district court found by a preponderance of the evidence that Dowd committed criminal sexual abuse. The district court's caution in making an alternative ruling does not detract from the jury's verdict. We conclude that the jury itself found sexual assault beyond a reasonable doubt because sexual assault was specifically charged in the indictment that was read to the jury. *See Apprendi,* 530 U.S. at 483 n.10 (holding that "the judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury"). Therefore,

we hold there was no Sixth Amendment violation in the district court's sentencing.

The district court, however, having found the sexual assualt enhancement applicable, proceeded to sentence under the mandatory sentencing regime. We have held that "where the district court did not treat the sentencing guidelines as advisory but the defendant's sentence was not enhanced by extra-verdict findings," a nonconstitutional sentencing error has occurred. *See Ameline*, 409 F.3d at 1084 n.8. Understandably, the defendant did not raise this statutory error before the district court, and we therefore apply plain error review. Because the sentencing guidelines are no longer mandatory — and we cannot ascertain whether the district court would have imposed a different sentence under a discretionary regime — we leave up to the parties whether we should remand to the district court for reconsideration of Dowd's sentence. *Id.* at 1084 ("When faced with an unpreserved *Booker/Fanfan* error, the reviewing panel must first determine if an eligible party wants to pursue the subject.").

## V.

We AFFIRM Dowd's conviction under the interstate domestic violence statute, and the district court's imposition of a consecutive sentence and sexual assault enhancement. We ORDER the parties to notify the court within 10 days of the filing of this opinion if either wants to pursue an *Ameline* remand.